# KERN COUNTY LAND CO. *v.* OCCIDENTAL PETROLEUM CORP.

No. 71–1059.   Argued December 5–6, 1972—Decided May 7, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and MARSHALL, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, in which BRENNAN and STEWART, JJ., joined, *post*, p. 605.

*David R. Hyde* argued the cause for petitioner. With him on the briefs were *F. Arnold Daum, William E. Hegarty,* and *Immanuel Kohn.*

*Whitney North Seymour* argued the cause for respondent. With him on the brief were *Louis Nizer, Paul Martinson,* and *Bernhardt K. Wruble.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Section 16 (b) of the Securities Exchange Act of 1934, 48 Stat. 896, 15 U. S. C. § 78p (b),[1] provides that officers,

---

[1] "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U. S. C. § 78p (b).

directors, and holders of more than 10% of the listed stock of any company shall be liable to the company for any profits realized from any purchase and sale or sale and purchase of such stock occurring within a period of six months. Unquestionably, one or more statutory purchases occur when one company, seeking to gain control of another, acquires more than 10% of the stock of the latter through a tender offer made to its shareholders. But is it a § 16 (b) "sale" when the target of the tender offer defends itself by merging into a third company and the tender offeror then exchanges his stock for the stock of the surviving company and also grants an option to purchase the latter stock that is not exercisable within the statutory six-month period? This is the question before us in this case.

I

On May 8, 1967, after unsuccessfully seeking to merge with Kern County Land Co. (Old Kern),[2] Occidental Petroleum Corp. (Occidental)[3] announced an offer, to expire on June 8, 1967, to purchase on a first-come, first-served basis 500,000 shares of Old Kern common stock[4] at a price of $83.50 per share plus a broker-

---

[2] Old Kern was a California corporation having substantial real estate holdings, including oil-producing lands, oil-exploration activities, cattle ranching, cattle-feeding operations, and interests in the manufacture of automotive parts, electronic systems and devices, and farm machinery and construction equipment. After the reorganization described in the text, Old Kern became known as the 600 California Corporation until its eventual dissolution under California law on October 6, 1967.

[3] Occidental is the respondent in this Court. A California corporation with its principal place of business in California, Occidental is engaged in the production and sale of oil, gas, coal, sulphur, and fertilizers.

[4] The Old Kern stock was registered pursuant to § 12 of the Securities Exchange Act of 1934, as amended, 15 U. S. C. § 78l. The stock was a nonexempt, equity security for purposes of § 16 (b).

age commission of $1.50 per share.[5] By May 10, 1967, 500,000 shares, more than 10% of the outstanding shares of Old Kern,[6] had been tendered. On May 11, Occidental extended its offer to encompass an additional 500,000 shares. At the close of the tender offer, on June 8, 1967, Occidental owned 887,549 shares of Old Kern.[7]

Immediately upon the announcement of Occidental's tender offer, the Old Kern management undertook to frustrate Occidental's takeover attempt. A management letter to all stockholders cautioned against tender and indicated that Occidental's offer might not be the best available, since the management was engaged in merger discussions with several companies. When Occidental extended its tender offer, the president of Old Kern sent a telegram to all stockholders again advising against tender. In addition, Old Kern undertook merger dis-

---

[5] The Old Kern stock closed at 63⅝ on Friday, May 8, 1967, the last trading day prior to the announcement of the tender offer. It had reached a high of 64⅞ and a low of 57⅜ in 1967, a high of 76¼ and a low of 51¾ in 1966, a high of 71⅝ and a low of 56 in 1965, and a high of 70⅜ and a low of 56⅝ in 1964. Thus, the $85-per-share tender-offer price represented a substantial profit for shareholders of Old Kern.

[6] On May 10, Old Kern had 4,328,000 shares outstanding.

[7] On May 18, 1967, Occidental filed a Form 3, Initial Statement of Beneficial Ownership of Securities, with the Securities and Exchange Commission indicating direct ownership of 507,055 shares of Old Kern stock; on June 9, 1967, Occidental filed a Form 4, Statement of Changes in Beneficial Ownership of Securities, for the month of May, indicating the purchase of an additional 376,326 shares of Old Kern stock, for a total ownership as of May 31, 1967, of 883,381 shares. An additional 4,168 shares were purchased by June 8, 1967, so that as of June 30, 1967, Occidental held 887,549 shares of Old Kern stock. This figure included 1,900 shares which Occidental purchased on the open market in April 1967. Section 16 (b) liability is not asserted with respect to these shares, because these purchases did not make Occidental a "beneficial owner" for purposes of § 16 (b).

cussions with Tenneco, Inc. (Tenneco),[8] and, on May 19, 1967, the Board of Directors of Old Kern announced that it had approved a merger proposal advanced by Tenneco.[9] Under the terms of the merger, Tenneco would acquire the assets, property, and goodwill of Old Kern, subject to its liabilities, through "Kern County Land Co." (New Kern),[10] a new corporation to be formed by Tenneco to receive the assets and carry on the business of Old Kern. The shareholders of Old Kern would receive a share of Tenneco cumulative convertible preference stock in exchange for each share of Old Kern common stock which they owned. On the same day, May 19, Occidental, in a quarterly report to stockholders, appraised the value of the new Tenneco stock at $105 per share.[11]

---

[8] Tenneco, a Delaware corporation, is a diversified industrial company with operations in natural gas transmission, oil and gas, chemicals, packaging, manufacturing, and shipbuilding. Tenneco is not a party to this litigation.

[9] Although technically a sale of assets, the corporate combination has been consistently referred to by the parties as a "merger" and will be similarly denominated in this opinion. The only significance of the characterization is the fact that a sale of assets required, under California law, approval of only a majority of the Old Kern shareholders and provided no appraisal rights for dissenters.

[10] New Kern, a Delaware corporation with its principal place of business in California, is the petitioner in this Court and is a wholly owned subsidiary of Tenneco Corp. Tenneco Corp. is, in turn, a wholly owned subsidiary of Tenneco and owns all of the capital stock or controlling interests in most of Tenneco's nonpipeline operating subsidiaries. When first incorporated, New Kern was known as KCL Corp.

[11] The annual dividend of $5.50 per share on the new Tenneco stock would be more than double the current annual dividend of $2.60 per share on the Old Kern stock. Each share of the new Tenneco preference stock was convertible into 3.6 shares of Tenneco common stock. During 1967, Tenneco common stock had sold at a high of 32½ and a low of 20⅞. Moreover, in contrast to Occidental's cash offer, the Tenneco exchange was expected to be, and

Occidental, seeing its tender offer and takeover attempt being blocked by the Old Kern-Tenneco "defensive" merger, countered on May 25 and 31 with two mandamus actions in the California courts seeking to obtain extensive inspection of Old Kern books and records.[12] Realizing that, if the Old Kern-Tenneco merger were approved and successfully closed, Occidental would have to exchange its Old Kern shares for Tenneco stock and would be locked into a minority position in Tenneco, Occidental took other steps to protect itself. Between May 30 and June 2, it negotiated an arrangement with Tenneco whereby Occidental granted Tenneco Corp., a subsidiary of Tenneco, an option to purchase at $105 per share all of the Tenneco preference stock to which Occidental would be entitled in exchange for its Old Kern stock when and if the Old Kern-Tenneco merger was closed.[13] The premium to secure the option, at $10 per share, totaled $8,866,230 and was to be paid immediately upon the signing of the option agreement.[14] If the option were exercised, the premium was to be applied to the purchase price. By the terms of the option agreement, the option could not be exercised prior to Decem-

---

was ultimately approved by the Internal Revenue Service as, free of capital gains tax.

[12] Prior to any court ruling on Occidental's mandamus petitions, Old Kern voluntarily permitted inspection of Old Kern's general ledger, consolidated financial statements, consolidated journal entries, details of cash receipts from oil operations, supporting trial balances, and other records over a six-day period. A list of stockholders, however, was withheld.

[13] The agreement covered 886,623 shares. This figure is 926 shares less than the number of Old Kern shares ultimately owned by Occidental. This discrepancy apparently results from uncertainty as to the number of shares tendered.

[14] An outside investment banking firm in New York had determined that between $9 and $12 per share was a fair premium on an option on the Old Kern stock.

ber 9, 1967, a date six months and one day after expiration of Occidental's tender offer.   On June 2, 1967, within six months of the acquisition by Occidental of more than 10% ownership of Old Kern, Occidental and Tenneco Corp. executed the option.[15]   Soon thereafter, Occidental announced that it would not oppose the Old Kern-Tenneco merger and dismissed its state court suits against Old Kern.[16]

The Old Kern-Tenneco merger plan was presented to and approved by Old Kern shareholders at their meeting on July 17, 1967.   Occidental refrained from voting its Old Kern shares, but in a letter read at the meeting Occidental stated that it had determined prior to June 2 not to oppose the merger and that it did not consider the plan unfair or inequitable.[17]   Indeed, Occidental indicated that, had it been voting, it would have voted in favor of the merger.

Meanwhile, the Securities and Exchange Commission had refused Occidental's request to exempt from possible § 16 (b) liability Occidental's exchange of its Old Kern stock for the Tenneco preference shares that would take

---

[15] On that date, and on the date of the exercise of the option, Old Kern common stock was selling at approximately $95 per share.

[16] Seeking to prevent its acquisition of Tenneco shares pursuant to the merger from being matched with the sale of those shares upon exercise of the option for purposes of establishing § 16 (b) liability, Occidental asked that the new Tenneco stock not be immediately registered pursuant to § 12 of the Securities Exchange Act of 1934, 15 U. S. C. § 78l.   See 450 F. 2d 157, 160 n. 6.

[17] The letter indicated that Occidental "did not consider it to be in its best interest, or the best interest of its shareholders, or the best interest of KCL Shareholders generally for it to [oppose] the transaction."   However, Occidental stated that "[i]n view of the fact that we would rather have worked out our own transaction with KCL, we shall not vote our KCL shares at the KCL Shareholder's Meeting on July 17, 1967."   Under applicable California law, the abstention from voting was tantamount to opposing the merger.

place when and if the merger transaction were closed. Various Old Kern stockholders, with Occidental's interests in mind, thereupon sought to delay consummation of the merger by instituting various lawsuits in the state and federal courts.[18]   These attempts were unsuccessful, however, and preparations for the merger neared completion with an Internal Revenue Service ruling that consummation of the plan would result in a tax-free exchange with no taxable gain or loss to Old Kern shareholders, and with the issuance of the necessary approval of the merger closing by the California Commissioner of Corporations.

The Old Kern-Tenneco merger transaction was closed on August 30.   Old Kern shareholders thereupon became irrevocably entitled to receive Tenneco preference stock, share for share in exchange for their Old Kern stock.   Old Kern was dissolved and all of its assets, including "all claims, demands, rights and choses in action accrued or to accrue under and by virtue of the Securities Exchange Act of 1934 . . . ," were transferred to New Kern.

The option granted by Occidental on June 2, 1967, was exercised on December 11, 1967.   Occidental, not having previously availed itself of its right, exchanged certificates representing 887,549 shares of Old Kern stock for a certificate representing a like number of shares of Tenneco preference stock.   The certificate was then endorsed over to the optionee-purchaser, and in return $84,229,185 was credited to Occidental's accounts at various banks. Adding to this amount the $8,886,230 premium paid in June, Occidental received $93,905,415 for its Old Kern stock (including the 1,900 shares acquired prior to issuance of its tender offer).   In addition, Occidental received dividends totaling $1,793,439.22.   Occidental's

[18] This history of this litigation is reviewed in *600 California Corp. v. Harjean Co.*, 284 F. Supp. 843 (ND Tex. 1968).

total profit was $19,506,419.22 on the shares obtained through its tender offer.

On October 17, 1967, New Kern instituted a suit under § 16 (b) against Occidental to recover the profits which Occidental had realized as a result of its dealings in Old Kern stock. The complaint alleged that the execution of the Occidental-Tenneco option on June 2, 1967, and the exchange of Old Kern shares for shares of Tenneco to which Occidental became entitled pursuant to the merger closed on August 30, 1967, were both "sales" within the coverage of § 16 (b). Since both acts took place within six months of the date on which Occidental became the owner of more than 10% of the stock of Old Kern, New Kern asserted that § 16 (b) required surrender of the profits realized by Occidental.[19] New Kern eventually moved for summary judgment, and, on December 27, 1970, the District Court granted summary judgment in favor of New Kern. *Abrams* v. *Occidental Petroleum Corp.*, 323 F. Supp. 570 (SDNY 1970). The District Court held that the execution of the option on June 2, 1967, and the exchange of Old Kern shares for shares of Tenneco on August 30, 1967, were "sales" under § 16 (b). The Court ordered Occidental to disgorge its profits plus interest. In a supplemental opinion, Occidental was also ordered to refund the dividends which it had received plus interest.

On appeal, the Court of Appeals reversed and ordered summary judgment entered in favor of Occidental. *Abrams* v. *Occidental Petroleum Corp.*, 450 F. 2d 157 (CA2 1971). The Court held that neither the option nor the exchange constituted a "sale" within the purview of

---

[19] Occidental answered asserting various affirmative defenses and one was subsequently begun. The four suits were counterclaims. Two suits had already been instituted by Old Kern shareholders, and consolidated.

§ 16 (b).[20]  We granted certiorari.  405 U. S. 1064 (1972).
We affirm.

## II

Section 16 (b) provides, *inter alia,* that a statutory insider[21] must surrender to the issuing corporation "any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security[22] of such issuer . . . within any period of less than six months." As specified in its introductory clause, § 16 (b) was enacted "[f]or the purpose of preventing the unfair use of information which may have been obtained by [a statutory insider] . . . by reason of his relationship to the issuer." Congress recognized that short-swing speculation by stockholders with advance, inside information would threaten the goal of the Securities Exchange Act to "insure the maintenance of fair and honest markets."

---

[20] In view of its disposition, the Court of Appeals did not reach Occidental's contentions that only the purchases in excess of 10% of Old Kern's stock, rather than all purchases made pursuant to the tender offer, should be included in calculating liability and that the awards of prejudgment interest and dividends were improper. Occidental also appealed from the dismissal of its counterclaims. The Court of Appeals dismissed Occidental's appeal as moot.

[21] For purposes of § 16 (b), a statutory insider includes a "beneficial owner, director, or officer." 15 U. S. C. § 78p (b). The term "beneficial owner" refers to one who owns "more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* [§ 12] of this title." 15 U. S. C. § 78p (a).

[22] The term "equity security" is defined to include "any stock or similar security; or any security convertible, with or without consideration, into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right; or any other security which the Commission shall deem to be of similar nature and consider necessary or appropriate, by such rules and regulations as it may prescribe in the public interest or for the protection of investors, to treat as an equity security." 15 U. S. C. § 78c (a) (11).

15 U. S. C. § 78b. Insiders could exploit information not generally available to others to secure quick profits. As we have noted, "the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." *Reliance Electric Co.* v. *Emerson Electric Co.,* 404 U. S. 418, 422 (1972). As stated in the report of the Senate Committee, the bill aimed at protecting the public "by preventing directors, officers, and principal stockholders of a corporation . . . from speculating in the stock on the basis of information not available to others." S. Rep. No. 792, 73d Cong., 2d Sess., 9 (1934).[23]

---

[23] The legislative history of § 16 (b) reveals a congressional effort to curb short-swing trading by insiders whose position gives them access to information not available to the investing public and the ability to influence corporate policy.

"Among the most vicious practices unearthed at the hearings before the subcommittee was the flagrant betrayal of their fiduciary duties by directors and officers of corporations who used their positions of trust and the confidential information which came to them in such positions, to aid them in their market activities. Closely allied to this type of abuse was the unscrupulous employment of inside information by large stockholders who, while not directors and officers, exercised sufficient control over the destinies of their companies to enable them to acquire and profit by information not available to others." S. Rep. No. 1455, 73d Cong., 2d Sess., 55 (1934).

See also 10 S. E. C. Ann. Rep. 50 (1944); S. Rep. No. 792, 73d Cong., 2d Sess., 9 (1934).

"The Securities Exchange Act of 1934 aims to protect the interests of the public against the predatory operations of directors, officers, and principal stockholders of corporations by preventing them from speculating in the stock of the corporations to which they owe a fiduciary duty. . . . By this section [16 (b)] it is rendered unlawful for persons intrusted with the administration of corporate affairs or vested with substantial control over corporations to use inside infor-

Although traditional cash-for-stock transactions that result in a purchase and sale or a sale and purchase within the six-month, statutory period are clearly within the purview of § 16 (b), the courts have wrestled with the question of inclusion or exclusion of certain "unorthodox" transactions.[24] The statutory definitions of "purchase"

---

mation for their own advantage." S. Rep. No. 1455, 73d Cong., 2d Sess., 68 (1934).

The purpose and operation of § 16 (b) were explained as follows by one of its draftsmen.

"[Section 16 (b)] is to prevent directors receiving the benefits of short-term speculative swings on the securities of their own companies, because of inside information. The profit on such transaction under the bill would go to the corporation. You hold the director, irrespective of any intention or expectation to sell the security within 6 months after, because it will be absolutely impossible to prove the existence of such intention or expectation, and you have to have this crude rule of thumb, because you cannot undertake the burden of having to prove that the director intended, at the time he bought, to get out on a short swing." Hearings on Stock Exchange Practices before the Senate Committee on Banking and Currency, 73d Cong., 2d Sess., pt. 15, p. 6557 (1934).

See generally Hearings on H. R. 7852 and H. R. 8720 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 2d Sess., 85 (1934); Hearings on Stock Exchange Practices, *supra*, at 6463–6581 (1934); S. Rep. No. 792, 73d Cong., 2d Sess., 7–9 (1934); S. Rep. No. 1455, 73d Cong., 2d Sess., 55–68 (1934); H. R. Rep. No. 1383, 73d Cong., 2d Sess., 13–14 (1934). See also *Blau* v. *Lamb*, 363 F. 2d 507 (CA2 1966), cert. denied, 385 U. S. 1002 (1967); *Smolowe* v. *Delendo Corp.*, 136 F. 2d 231 (CA2), cert. denied, 320 U. S. 751 (1943); Yourd, Trading in Securities by Directors, Officers and Stockholders: Section 16 of the Securities Exchange Act, 38 Mich. L. Rev. 133 (1939); Meeker & Cooney, The Problem of Definition in Determining Insider Liabilities Under Section 16 (b), 45 Va. L. Rev. 949 (1959); Comment, Stock Exchanges Pursuant to Corporate Consolidation: A Section 16 (b) "Purchase or Sale?," 117 U. Pa. L. Rev. 1034 (1969).

[24] The term, see 2 L. Loss, Securities Regulation 1069 (2d ed. 1961), has been applied to stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights, and warrants.

and "sale" are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase.[25] In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information [26]—thereby endeavoring to implement con-

---

[25] "When used in this chapter, unless the context otherwise requires—

.        .        .        .        .

"(13) The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire.
"(14) The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of." 15 U. S. C. §§ 78c (a)(13), (14).

[26] Several decisions have been read as to apply a so-called "objective" test in interpreting and applying § 16 (b). See, e. g., *Smolowe* v. *Delendo Corp., supra; Park & Tilford* v. *Schulte,* 160 F. 2d 984 (CA2), cert. denied, 332 U. S. 761 (1947); *Heli-Coil Corp.* v. *Webster,* 352 F. 2d 156 (CA3 1965). Under some broad language in those decisions, § 16 (b) is said to be applicable whether or not the transaction in question could possibly lend itself to the types of speculative abuse that the statute was designed to prevent. By far the greater weight of authority is to the effect that a "pragmatic" approach to § 16 (b) will best serve the statutory goals. See, e. g., *Roberts* v. *Eaton,* 212 F. 2d 82 (CA2), cert. denied, 348 U. S. 827 (1954); *Ferraiolo* v. *Newman,* 259 F. 2d 342 (CA6 1958), cert. denied, 359 U. S. 927 (1959); *Blau* v. *Max Factor & Co.,* 342 F. 2d 304 (CA9), cert. denied, 382 U. S. 892 (1965); *Blau* v. *Lamb, supra; Petteys* v. *Butler,* 367 F. 2d 528 (CA8 1966), cert. denied, 385 U. S. 1006 (1967). For a discussion and critical appraisal of the various "approaches" to the interpretation and application of § 16 (b), see Lowenfels, Section 16 (b): A New Trend in Regulating Insider Trading, 54 Cornell L. Q. 45 (1968); Comment, Stock Exchanges Pursuant to Corporate Consolidation: A Section 16 (b) "Purchase or Sale?," 117 U. Pa. L. Rev. 1034 (1969); Note, *Reliance Electric* and 16 (b) Litigation: A Return to the Objective Approach?, 58 Va. L. Rev. 907 (1972); Gadsby & Treadway, Recent Developments Under Section

gressional objectives without extending the reach of the statute beyond its intended limits. The statute requires the inside, short-swing trader to disgorge all profits realized on all "purchases" and "sales" within the specified time period, without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information. Under these strict terms, the prevailing view is to apply the statute only when its application would serve its goals. "[W]here alternative constructions of the terms of § 16 (b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders." *Reliance Electric Co.* v. *Emerson Electric Co.,* 404 U. S., at 424. See *Blau* v. *Lamb,* 363 F. 2d 507 (CA2 1966), cert. denied, 385 U. S. 1002 (1967). Thus, "[i]n interpreting the terms 'purchase' and 'sale,' courts have properly asked whether the particular type of transaction involved is one that gives rise to speculative abuse." *Reliance Electric Co.* v. *Emerson Electric Co., supra,* at 424 n. 4.[27]

In the present case, it is undisputed that Occidental became a "beneficial owner" within the terms of § 16 (b) when, pursuant to its tender offer, it "purchased" more than 10% of the outstanding shares of Old Kern. We must decide, however, whether a "sale" within the ambit of the statute took place either when Occidental became irrevocably bound to exchange its shares of Old Kern for shares of Tenneco pursuant to the terms of the merger agreement between Old Kern and Tenneco or

---

16 (b) of the Securities Exchange Act of 1934, 17 N. Y. L. F. 687 (1971).

[27] Our differences with the dissent as to the reach and scope of congressional intent and purpose are clear. If we are mistaken, or if Congress would now mandate a different result, the statutory remedy would not be difficult to fashion.

when Occidental gave an option to Tenneco to purchase from Occidental the Tenneco shares so acquired.[28]

## III

On August 30, 1967, the Old Kern-Tenneco merger agreement was signed, and Occidental became irrevocably entitled to exchange its shares of Old Kern stock for shares of Tenneco preference stock. Concededly, the transaction must be viewed as though Occidental had made the exchange on that day. But, even so, did the exchange involve a "sale" of Old Kern shares within the meaning of § 16 (b)? We agree with the Court of Appeals that it did not, for we think it totally unrealistic to assume or infer from the facts before us that Occidental either had or was likely to have access to inside information, by reason of its ownership of more than 10% of the outstanding shares of Old Kern, so as to afford it an opportunity to reap speculative, short-swing profits from its disposition within six months of its tender-offer purchases.

It cannot be contended that Occidental was an insider when, on May 8, 1967, it made an irrevocable offer to purchase 500,000 shares of Old Kern stock at a price substantially above market. At that time, it owned only 1,900 shares of Old Kern stock, far fewer than the 432,000 shares needed to constitute the 10% ownership required by the statute. There is no basis for find-

---

[28] Both events occurred within six months of Occidental's first acquisition of Old Kern shares pursuant to its tender offer. Although Occidental did not exchange its Old Kern shares until December 11, 1967, it is not contended that that date, rather than the date on which Occidental became irrevocably bound to do so, should control. Similarly, although the option was not exercised until December 11, 1967, no liability is asserted with respect to that event, because it occurred more than six months after Occidental's last acquisition of Old Kern stock.

ing that, at the time the tender offer was commenced, Occidental enjoyed an insider's opportunity to acquire information about Old Kern's affairs.

It is also wide of the mark to assert that Occidental, as a sophisticated corporation knowledgeable in matters of corporate affairs and finance, knew that its tender offer would either succeed or would be met with a "defensive merger." If its takeover efforts failed, it is argued, Occidental knew it could sell its stock to the target company's merger partner at a substantial profit. Calculations of this sort, however, whether speculative or not and whether fair or unfair to other stockholders or to Old Kern, do not represent the kind of speculative abuse at which the statute is aimed, for they could not have been based on inside information obtained from substantial stockholdings that did not yet exist. Accepting both that Occidental made this very prediction and that it would recurringly be an accurate forecast in tender-offer situations,[29] we nevertheless fail to perceive how the fruition of such anticipated events would require, or in any way depend upon, the receipt and use of inside information. If there are evils to be redressed by way of deterring those who would make tender offers,

---

[29] Although a "defensive merger" is one tactic available to incumbent management in its arsenal of antitender-offer weapons, it is by no means a foregone conclusion that it is the response that will be most often, much less invariably, employed. Incumbent management might, for instance, choose to exhort shareholders not to tender, employ various techniques to elevate the market price of the company's stock in order to make the tender offer less attractive, institute legal proceedings, or increase the company's outstanding stock. Any one of these devices might prove more attractive to incumbent management than a defensive merger which could prove to be highly detrimental to the enterprise. See Note, Defensive Tactics Employed by Incumbent Managements in Contesting Tender Offers, 21 Stan. L. Rev. 1104 (1969).

§ 16 (b) does not appear to us to have been designed for this task.

By May 10, 1967, Occidental had acquired more than 10% of the outstanding shares of Old Kern. It was thus a statutory insider when, on May 11, it extended its tender offer to include another 500,000 shares. We are quite unconvinced, however, that the situation had changed materially with respect to the possibilities of speculative abuse of inside information by Occidental. Perhaps Occidental anticipated that extending its offer would increase the likelihood of the ultimate success of its takeover attempt or the occurrence of a defensive merger. But, again, the expectation of such benefits was unrelated to the use of information unavailable to other stockholders or members of the public with sufficient funds and the intention to make the purchases Occidental had offered to make before June 8, 1967.

The possibility that Occidental had, or had the opportunity to have, any confidential information about Old Kern before or after May 11, 1967, seems extremely remote. Occidental was, after all, a tender offeror, threatening to seize control of Old Kern, displace its management, and use the company for its own ends. The Old Kern management vigorously and immediately opposed Occidental's efforts. Twice it communicated with its stockholders, advising against acceptance of Occidental's offer and indicating prior to May 11 and prior to Occidental's extension of its offer, that there was a possibility of an imminent merger and a more profitable exchange. Old Kern's management refused to discuss with Occidental officials the subject of an Old Kern-Occidental merger. Instead, it undertook negotiations with Tenneco and forthwith concluded an agreement, announcing the merger terms on May 19. Requests by Occidental for inspection of Old Kern records were sufficiently frus-

trated by Old Kern's management to force Occidental to litigate to secure the information it desired.

There is, therefore, nothing in connection with Occidental's acquisition of Old Kern stock pursuant to its tender offer to indicate either the possibility of inside information being available to Occidental by virtue of its stock ownership or the potential for speculative abuse of such inside information by Occidental. Much the same can be said of the events leading to the exchange of Occidental's Old Kern stock for Tenneco preferred, which is one of the transactions that is sought to be classified a "sale" under § 16 (b). The critical fact is that the exchange took place and was required pursuant to a merger between Old Kern and Tenneco. That merger was not engineered by Occidental but was sought by Old Kern to frustrate the attempts of Occidental to gain control of Old Kern. Occidental obviously did not participate in or control the negotiations or the agreement between Old Kern and Tenneco. Cf. *Newmark* v. *RKO General,* 425 F. 2d 348 (CA2), cert. denied, 400 U. S. 854 (1970); *Park & Tilford* v. *Schulte,* 160 F. 2d 984 (CA2), cert. denied, 332 U. S. 761 (1947). Once agreement between those two companies crystallized, the course of subsequent events was out of Occidental's hands. Old Kern needed the consent of its stockholders, but as it turned out, Old Kern's management had the necessary votes without the affirmative vote of Occidental. The merger agreement was approved by a majority of the stockholders of Old Kern, excluding the votes to which Occidental was entitled by virtue of its ownership of Old Kern shares. See generally *Ferraiolo* v. *Newman,* 259 F. 2d 342 (CA6 1958), cert. denied, 359 U. S. 927 (1959); *Roberts* v. *Eaton,* 212 F. 2d 82 (CA2 1954). Occidental, although registering its opinion that the merger would be beneficial to Old Kern shareholders, did not in fact vote at the

stockholders' meeting at which merger approval was obtained. Under California law, its abstention was tantamount to a vote against approval of the merger. Moreover, at the time of stockholder ratification of the merger, Occidental's previous dealing in Old Kern stock was, as it had always been, fully disclosed.

Once the merger and exchange were approved, Occidental was left with no real choice with respect to the future of its shares of Old Kern. Occidental was in no position to prevent the issuance of a ruling by the Internal Revenue Service that the exchange of Old Kern stock for Tenneco preferred would be tax free; and, although various lawsuits were begun in state and federal courts seeking to postpone the merger closing beyond the statutory six-month period, those efforts were futile. The California Corporation Commissioner issued the necessary permits for the closing that took place on August 30, 1967. The merger left no right in dissenters to secure appraisal of their stock. Occidental could, of course, have disposed of its shares of Old Kern for cash before the merger was closed. Such an act would have been a § 16 (b) sale and would have left Occidental with a prima facie § 16 (b) liability. It was not, therefore, a realistic alternative for Occidental as long as it felt that it could successfully defend a suit like the present one. See generally *Petteys* v. *Butler,* 367 F. 2d 528 (CA8 1966), cert. denied, 385 U. S. 1006 (1967); *Ferraiolo* v. *Newman, supra; Lynam* v. *Livingston,* 276 F. Supp. 104 (Del. 1967); *Blau* v. *Hodgkinson,* 100 F. Supp. 361 (SDNY 1951). We do not suggest that an exchange of stock pursuant to a merger may never result in § 16 (b) liability. But the involuntary nature of Occidental's exchange, when coupled with the absence of the possibility of speculative abuse of inside information, convinces us that § 16 (b) should not apply to transactions such as this one.

## IV

Petitioner also claims that the Occidental-Tenneco option agreement should itself be considered a sale, either because it was the kind of transaction the statute was designed to prevent or because the agreement was an option in form but a sale in fact.   But the mere execution of an option to sell is not generally regarded as a "sale."   See *Booth* v. *Varian Associates,* 334 F. 2d 1 (CA1 1964), cert. denied, 379 U. S. 961 (1965); *Allis-Chalmers Mfg. Co.* v. *Gulf & Western Industries,* 309 F. Supp. 75 (ED Wis. 1970); *Marquette Cement Mfg. Co.* v. *Andreas,* 239 F. Supp. 962 (SDNY 1965).   And we do not find in the execution of the Occidental-Tenneco option agreement a sufficient possibility for the speculative abuse of inside information with respect to Old Kern's affairs to warrant holding that the option agreement was itself a "sale" within the meaning of § 16 (b).   The mutual advantages of the arrangement appear quite clear. As the District Court found, Occidental wanted to avoid the position of a minority stockholder with a huge investment in a company over which it had no control and in which it had not chosen to invest.   On the other hand, Tenneco did not want a potentially troublesome minority stockholder that had just been vanquished in a fight for the control of Old Kern.   Motivations like these do not smack of insider trading; and it is not clear to us, as it was not to the Court of Appeals, how the negotiation and execution of the option agreement gave Occidental any possible opportunity to trade on inside information it might have obtained from its position as a major stockholder of Old Kern.   Occidental wanted to get out, but only at a date more than six months thence.   It was willing to get out at a price of $105 per share, a price at which it had publicly valued Tenneco preferred on May 19 when the Tenneco-Old Kern agreement was announced.

In any event, Occidental was dealing with the putative new owners of Old Kern, who undoubtedly knew more about Old Kern and Tenneco's affairs than did Occidental. If Occidental had leverage in dealing with Tenneco, it is incredible that its source was inside information rather than the fact of its large stock ownership itself.

Neither does it appear that the option agreement, as drafted and executed by the parties, offered measurable possibilities for speculative abuse. What Occidental granted was a "call" option. Tenneco had the right to buy after six months, but Occidental could not force Tenneco to buy. The price was fixed at $105 for each share of Tenneco preferred. Occidental could not share in a rising market for the Tenneco stock See *Silverman* v. *Landa*, 306 F. 2d 422 (CA2 1962). If the stock fell more than $10 per share, the option might not be exercised, and Occidental might suffer a loss if the market further deteriorated to a point where Occidental was forced to sell. Thus, the option, by its very form, left Occidental with no choice but to sell if Tenneco exercised the option, which it was almost sure to do if the value of Tenneco stock remained relatively steady. On the other hand, it is difficult to perceive any speculative value to Occidental if the stock declined and Tenneco chose not to exercise its option. See generally Note, Put and Call Options Under Section 16 of the Securities Exchange Act, 69 Yale L. J. 868 (1960); H. Filer, Understanding Put and Call Options 96–111 (1959); G. Leffler, The Stock Market 363–378 (2d ed. 1957).

The option, therefore, does not appear to have been an instrument with potential for speculative abuse, whether or not Occidental possessed inside information about the affairs of Old Kern. In addition, the option covered Tenneco preference stock, a stock as yet unissued, unregistered, and untraded. It was the value of this

stock that underlay the option and that determined whether the option would be exercised, whether Occidental would be able to profit from the exercise, and whether there was any real likelihood of the exploitation of inside information. If Occidental had inside information when it negotiated and signed the option agreement, it was inside information with respect to Old Kern. Whatever it may have known or expected as to the future value of Old Kern stock, Occidental had no ownership position in Tenneco giving it any actual or presumed insights into the future value of Tenneco stock. That was the critical item of intelligence if Occidental was to use the option for purposes of speculation. Also, the date for exercise of the option was over six months in the future, a period that, under the statute itself, is assumed to dissipate whatever trading advantage might be imputed to a major stockholder with inside information. See Comment, Stock Exchanges Pursuant to Corporate Consolidation: A Section 16 (b) "Purchase or Sale?," 117 U. Pa. L. Rev. 1034, 1054 (1969); *Silverman* v. *Landa, supra.* By enshrining the statutory period into the option, Occidental also, at least if the statutory period is taken to accomplish its intended purpose, limited its speculative possibilities. Nor should it be forgotten that there was no absolute assurance that the merger, which was not controlled by Occidental, would be consummated. In the event the merger did not close, the option itself would become null and void.

Nor can we agree that we must reverse the Court of Appeals on the ground that the option agreement was in fact a sale because the premium paid was so large as to make the exercise of the option almost inevitable, particularly when coupled with Tenneco's desire to rid itself of a potentially troublesome stockholder. The argument has force, but resolution of the question is very much a matter of judgment, economic and otherwise, and the

Court of Appeals rejected the argument. That court emphasized that the premium paid was what experts had said the option was worth, the possibility that the market might drop sufficiently in the six months following execution of the option to make exercise unlikely, and the fact that here, unlike the situation in *Bershad* v. *McDonough*, 428 F. 2d 693 (CA7 1970), the optionor did not surrender practically all emoluments of ownership by executing the option. Nor did any other special circumstances indicate that the parties understood and intended that the option was in fact a sale.[30] We see no satisfactory basis or reason for disagreeing with the judgment of the Court of Appeals in this respect.[31]

The judgment of the Court of Appeals is affirmed.

*So ordered.*

---

[30] In *Bershad* v. *McDonough*, 428 F. 2d 693 (CA7 1970), the defendants were directors and greater-than-ten-percent stockholders of Cudahy Co. The defendants, within six months of their acquisition of beneficial ownership of Cudahy, granted an option to Smelting Refining & Mining Co. to purchase their Cudahy stock. The Seventh Circuit held that the grant of the option was a § 16 (b) "sale" of the Cudahy stock. The Court of Appeals in the present case distinguished *Bershad* as follows:

"That case came before the court of appeals on a finding by the district court that, under the circumstances there presented, the stock had in fact been sold within the six months period, although the option was not formally exercised until later. The district court had relied on a number of circumstances, the most significant being that the optionor gave the optionee an irrevocable proxy to vote the shares and that the optionor and one of his associate directors resigned as directors within a few days after the grant of the option and were replaced by officers of the optionee. In other words, the district court found in effect that the 'option' was accompanied by a wink of the eye, and the court of appeals sustained this. Here there is no such finding, and no basis for one." 450 F. 2d, at 165.

[31] With respect to entering judgment for Occidental, the dissent simply has a different, but insufficiently persuasive, view of the facts from that of Judge Friendly and his colleagues.

Mr. Justice Douglas, with whom Mr. Justice Brennan and Mr. Justice Stewart concur, dissenting.

The Court, in resorting to an *ad hoc* analysis of the "possibility for the speculative abuse of inside information," charts a course for the interpretation of § 16 (b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78p (b), that in my mind undermines the congressional purpose. I respectfully dissent.

I

"The statute is written broadly, and the liability it imposes is strict." *Reliance Electric Co.* v. *Emerson Electric Co.,* 404 U. S. 418, 431 (Douglas, J., dissenting). Except for narrowly drawn exceptions, it is all-inclusive.[1] The operative language provides:

"[A]ny profit realized by [a beneficial owner, director, or officer] from *any purchase and sale,* or

---

[1] Section 16 (b) provides in full:

"For the purpose of preventing the unfair use of information. which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or

any sale and purchase, of any equity security of such issuer (other than an exempted security) *within any period of less than six months,* unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, *irrespective of any intention* on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months." (Emphasis added.)

By its own terms, the section subsumes *all* transactions that are technically purchases and sales and applies irrespective of any actual or potential use of inside information to gain a trading advantage. See *Feder* v. *Martin Marietta Corp.,* 406 F. 2d 260, 262 (CA2 1969). The conclusion seems inescapable that Occidental Petroleum Corp. (Occidental) purchased and sold shares of Kern County Land Co. (Old Kern) within a six-month period and that this "round trip" in Old Kern stock is covered by the literal terms of § 16 (b).

Occidental, pursuant to a cash tender offer, acquired in excess of 880,000 shares of Old Kern during May and June 1967. It is undisputed that these acquisitions were purchases within the meaning of the section.[2] On Au-

---

the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U. S. C. § 78p (b).

[2] The term "purchase" includes "any contract to buy, purchase, or otherwise acquire." 15 U. S. C. § 78c (a) (13). A "beneficial owner" is one who owns "more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* [§ 12] of this title." 15 U. S. C. § 78p (a). The District Court held that "[t]he tender offer constituted a single act of Occidental, whereby the company became a beneficial

gust 30, 1967, Old Kern sold its assets to a newly formed subsidiary of Tenneco Corp., Kern County Land Co. (New Kern), in exchange for cumulative convertible preference stock of Tenneco, Inc. (Tenneco), Tenneco Corp.'s parent. Old Kern was dissolved in October 1967 (within six months of the tender offer), and each shareholder became irrevocably entitled to receive, share for share, for his Old Kern stock the cumulative convertible preference stock of Tenneco.

The question presented to us is whether this exchange of shares constituted a "sale" of the Old Kern shares. The term "sale," as used in the Securities Exchange Act, includes "any contract to sell or otherwise dispose of." 15 U. S. C. § 78c (a)(14). Clearly, Occidental "disposed" of its Old Kern shares through the Old Kern-Tenneco consolidation. Its status as a shareholder of Old Kern terminated, and it became instead a shareholder of Tenneco, privy to all the rights conferred by the Tenneco shares.[3] See *Newmark* v. *RKO General,* 425 F. 2d 348 (CA2 1970); *Park & Tilford* v. *Schulte,* 160 F. 2d 984 (CA2 1947).[4] In my view, we

owner of more than 10 percent of Old Kern's capital stock." 323 F. Supp. 570, 579. Thus, the District Court ruled that the profit made on all stock purchased in the tender offer, not only the profit on the purchases in excess of 10%, would have to be surrendered. The Court of Appeals did not reach this issue.

[3] This is not a case where the stock surrendered and the stock received in the exchange were economic equivalents. Cf., *e. g., Blau* v. *Lamb,* 363 F. 2d 507, 523–525 (CA2 1966); *Blau* v. *Max Factor & Co.,* 342 F. 2d 304, 308–309 (CA9 1965).

An exchange of securities in different companies is a "purchase" or "sale" for purposes of § 10 (b). *E. g., SEC* v. *National Securities, Inc.,* 393 U. S. 453; *Dasho* v. *Susquehanna Corp.,* 380 F. 2d 262 (CA7 1967).

[4] Judge Clark, in *Park & Tilford* v. *Schulte,* adopted a straightforward approach to defining "acquisition": "Defendants did not own the common stock in question before they exercised their option to

need look no further. As my Brother BLACKMUN, then Circuit Judge, stated in dissent in *Petteys* v. *Butler,* 367 F. 2d 528, 538 (CA8 1966):

> "My own reaction is that either the statute means what it literally says or that it does not; that if the Congress intended to provide additional exceptions, it would have done so in clear language; and that the recognized purpose and aim of the statute are more consistently and protectively to be served if the statute is construed literally and objectively rather than non-literally and subjectively on a case-by-case application. The latter inevitably is a weakening process."

The majority finesses the literal impact of § 16 (b) by examining Occidental's willfulness and its access to inside information. It concludes: "But the involuntary nature of Occidental's exchange, when coupled with the absence of the possibility of speculative abuse of inside information, convinces us that § 16 (b) should not apply to transactions such as this one." *Ante,* at 600. This approach is plainly contrary to the legislative purpose.

The purpose of § 16 (b) is stated in its preamble: "preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer . . . ." The congressional investigations that led to the enactment of the Securities Exchange Act revealed widespread use of confidential information by corporate insiders to gain an unfair advantage in trading their corporations' securities.[5] Unlike other remedial provisions

---

convert; they did afterward. Therefore they acquired the stock, within the meaning of the Act." 160 F. 2d 984, 987. The same analysis holds for "disposition."

[5] Examples of this practice are chronicled elsewhere. See, *e. g., Reliance Electric Co.* v. *Emerson Electric Co.,* 404 U. S. 418, 429–430

of the Act, the most noteworthy being § 10 (b), 15 U. S. C. § 78j (b), Congress drafted § 16 (b) as an objective rule, designed to have a clearly "prophylactic" effect. *Blau* v. *Lehman,* 368 U. S. 403, 414. See *Heli-Coil Corp.* v. *Webster,* 352 F. 2d 156, 165–166 (CA3 1965); *Smolowe* v. *Delendo Corp.,* 136 F. 2d 231, 235 (CA2 1943). As Thomas Corcoran, a principal draftsman of the Act, explained to Congress:

> "You hold the director, irrespective of any intention or expectation to sell the security within 6 months after, because it will be absolutely impossible to prove the existence of such intention or expectation, and you have to have this crude rule of thumb, because you cannot undertake the burden of having to prove that the director intended, at the time he bought, to get out on a short swing." [6]

In *Reliance Electric, supra,* the Court noted that "the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a *class of transactions* in which the possibility of abuse was believed to be intolerably great." 404 U. S., at 422 (emphasis added). Certainly, mergers are such a class of transactions.[7] In *Newmark* v. *RKO General, supra,* for example, RKO signed an option contract to purchase shares of the company which was to be merged into a subsidiary of RKO. When the merger was approved by the necessary parties, RKO exercised its option and the merger was consummated. The court found that RKO "not only acquired knowledge of what would tran-

---

and nn. 3–6 (DOUGLAS, J., dissenting) and sources cited therein. It would serve no purpose to recount them here.

[6] Hearings on Stock Exchange Practices before the Senate Committee on Banking and Currency, 73d Cong., 2d Sess., pt. 15, p. 6557 (1934).

[7] See Recent Cases, 84 Harv. L. Rev. 1012, 1018 (1971).

spire but also could exercise substantial influence over the course of events." 425 F. 2d, at 353. "In sum," the court concluded, "the purchase and subsequent exchange of Central shares were fraught with opportunities for the kind of speculative abuse section 16 (b) was intended to abort." *Id.*, at 354.

The Securities and Exchange Commission has resisted a rule that would exempt mergers as a class from the operation of § 16 (b). It responded as follows to a proposal of the Special Committee on Securities Regulation of the Association of the Bar of the City of New York: [8]

> "We concluded, however, that removing the 'teeth' of Section 16 (b) to discourage the use of inside information would allow insiders to create and take advantage of speculative opportunities during the time surrounding such significant corporate events which outweighed this potential conflict. Also, we know that some persons are unwittingly caught by the section in these as in other situations falling within the provisions of Section 16 (b), but in our opinion the public interest and the interest of investors are better served in this area by the unrestricted operation of the section."

It is true that in some cases an insider may be required to disgorge profits even though his transactions do not lend themselves to the abuses that underlay the enactment of § 16 (b). The draftsmen carefully weighed this eventuality and opted for a bright-line rule. As Thomas Corcoran stated: "You have to have a general rule. In particular transactions it might work a hardship, but those transactions that are a hardship represent the sacrifice to the necessity of having a general rule." [9]

---

[8] Letter of Nov. 24, 1965.

[9] Hearings, *supra,* n. 6, at 6558.

The very construction of § 16 (b) reinforces the conclusion that the section is based in the first instance [10] on a totally objective appraisal of the relevant transactions.[11]   See *Smolowe* v. *Delendo Corp., supra,* at 236. Had the draftsmen intended that the operation of the section hinge on abuse of access to inside information it would have been anomalous to limit the section to purchases and sales occurring within six months.[12]   Indeed, the purpose of the six-month limitation, coupled with the definition of an insider, was to create a *conclusive presumption* that an insider who turns a short-swing profit in the stock of his corporation had access to inside information *and* capitalized on that information by speculating in the stock.   But, the majority departs from the benign effects of this presumption when it assumes that it is "totally unrealistic to assume or infer from the facts before us that Occidental either had or was likely to have access to inside information . . . ."   *Ante,* at 596. The majority abides by this assumption even for that period after which Occidental became a 10% shareholder and then extended its tender offer in order to purchase additional Old Kern shares.

The majority takes heart from those decisions of lower federal courts which endorse a "pragmatic" approach to

---

[10] The objective approach may have to yield to a more flexible interpretation of the terms "purchase" and "sale" to include transactions which present the evil Congress sought to eliminate or transactions which are designed to evade § 16 (b).   See discussion, *infra,* at 612–613.

[11] The preamble of the section, which expresses the purpose of the section, was intended to aid in establishing the constitutionality of the section and guiding the Commission's rulemaking authority.   See *Smolowe* v. *Delendo Corp.,* 136 F. 2d 231, 236 (CA2 1943) ; 2 L. Loss, Securities Regulation 1041 (2d ed. 1961).

[12] In addition, there would have been no reason to exempt transactions wherein the "security was acquired in good faith in connection with a debt previously contracted . . . ."

§ 16 (b). Many involved the question whether a conversion of one security of an issuer into another security of the same issuer constituted a purchase or a sale.[13] It would serve no purpose to parse their holdings because, as Louis Loss describes, they have a "generalization-defying nature."[14] In 1966 the Securities and Exchange Commission exercised its exemptive power under § 16 (b) to adopt Rule 16b–9,[15] which under specified conditions excludes a conversion from the operation of § 16 (b). This rule will relieve the courts of much of the burden that has developed from *ad hoc* analyses in this narrow area. But, by sanctioning the approach of these cases, the majority brings to fruition Louis Loss' prophecy that they will "continue to rule us from their graves,"[16] for henceforth they certainly will be applied by analogy to the area of mergers and other consolidations.

Thus, the courts will be caught up in an *ad hoc* analysis of each transaction, determining both from the economics of the transaction and the *modus operandi* of the insider whether there exists the possibility of speculative abuse of inside information. Instead of a section that is easy to administer and by its clearcut terms discourages litigation, we have instead a section that fosters litigation because the Court's decision holds out the hope for the insider that he may avoid § 16 (b) liability. In short, the majority destroys much of the section's prophylactic effect. I would be the first to agree that "[e]very transaction which can reasonably be defined as a purchase [should] be so defined, if the transaction is of a kind

---

[13] See, *e. g.*, *Roberts* v. *Eaton*, 212 F. 2d 82 (CA2 1954); *Ferraiolo* v. *Newman*, 259 F. 2d 342 (CA6 1958); *Blau* v. *Max Factor & Co.*, 342 F. 2d 304 (CA9 1965); *Blau* v. *Lamb*, 363 F. 2d 507 (CA2 1966); *Petteys* v. *Butler*, 367 F. 2d 528 (CA8 1966).

[14] 5 L. Loss, Securities Regulation 3029 (Supp. to 2d ed. 1969).

[15] Securities Exchange Act Release 7826.

[16] 5 L. Loss, Securities Regulation 3029 (Supp. to 2d ed. 1969).

which can possibly lend itself to the speculation encompassed by Section 16 (b)." *Ferraiolo* v. *Newman,* 259 F. 2d 342, 345 (CA6 1958) (STEWART, J., then Circuit Judge). See also *Reliance Electric Co.* v. *Emerson Electric Co.,* 404 U. S., at 424. Certainly we cannot allow transactions which present the possibility of abuse but do not fall within the classic conception of a purchase or sale to escape the confines of § 16 (b). It is one thing to interpret the terms "purchase" and "sale" liberally in order to include those transactions which evidence the evil Congress sought to eliminate; it is quite another to abandon the bright-line test of § 16 (b) for those transactions which clearly fall within its literal bounds. Section 16 (b), because of the six-month limitation, allows some to escape who have abused their inside information. It should not be surprising, given the objective nature of the rule, if some are caught unwillingly.

In *Reliance Electric, supra,* at 422, the Court quoted with approval the following language from *Bershad* v. *McDonough,* 428 F. 2d 693, 696 (CA7 1970):

> "In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16 (b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect."

It is this "objective standard" that the Court hung to so tenaciously in *Reliance Electric,* but now apparently would abandon to a large extent. In my view, the Court

improperly takes upon itself the task of refashioning the contours of § 16 (b) [17] and changing its essential thrust.

## II

Although I conclude that the judgment below should be reversed on the grounds that the exchange of shares constituted a sale, I could not conclude that it was proper for the Court of Appeals to direct entry of summary judgment in favor of Occidental even if I accepted the majority approach to § 16 (b). It did this notwithstanding the failure of Occidental to move for summary judgment in the District Court. To say the least, this is an extraordinary procedure.[18] Even if it can be justified in the most limited circumstances—for example, where the record below left no doubt whatsoever that the nonmoving party was entitled to summary judgment as a matter of law—this is not such a case.

The District Court concluded that "[i]n consequence of the option agreement, Occidental disposed of its holdings in Old Kern stock at a profit of about $20 per share . . . . This profit falls within the meaning and purview of Section 16 (b) . . . ." 323 F. Supp. 570, 579–580. Since the actual sale pursuant to the exercise of the option did not occur within the six-month period, the only reasonable interpretation of this conclusion of law is that the District Court found that the execution of the option was in fact and substance a sale. The majority does not contest that an option agreement may

---

[17] Occidental unsuccessfully sought to have the Securities and Exchange Commission adopt a rule which would have exempted this exchange. No inferences should be drawn from this refusal. But, I do believe that, given the structure and policies of § 16 (b), any "exempting" is best left to the Commission and Congress. See *Heli-Coil Corp.* v. *Webster*, 352 F. 2d 156, 165–166 (CA3 1965).

[18] See generally 6 J. Moore, Federal Practice ¶ 56.12 (2d ed. 1972).

be in economic reality a sale. See *Bershad* v. *McDonough,*
*supra.* It distinguishes but does not reject *Bershad.*
Rather, the majority can "see no satisfactory basis or
reason for disagreeing" with the Court of Appeals, which
concluded that there is "no basis" for a finding that
Occidental's Old Kern stock was "sold" upon execution
of the option.[19]   I cannot agree.

In *Bershad,* the defendants, who had purchased ap-
proximately 18% of the outstanding shares of Cudahy
Co. at $6.75 per share, executed an option obligat-
ing themselves to sell the shares at $9 per share.   The
market price of the shares was then $9.125.   The optionee
paid $350,000 (14% of the purchase price) for the option,
to be applied against the purchase price in the event of
exercise and forfeited in the event of nonexercise.   In
addition, defendants gave the optionee an irrevocable
proxy with respect to the optioned stock, and defendant
McDonough and his colleagues resigned from the Cudahy
board of directors.   The Court of Appeals also found
that "[t]he circumstances of the transactions clearly indi-
cate that the stock was effectively transferred, for all
practical purposes, long before the exercise of the option."
428 F. 2d, at 698.

By comparison, the exercise price here was $105, and
the premium to secure the option was $10 per share, or
$8,866,230, also to be credited against the purchase price
if the option were exercised and forfeited in the event
of nonexercise if the merger was consummated.   Thus,
the effective exercise price was nearly 10% below the
estimated value of the Tenneco shares to be received in

---

[19] The Court of Appeals also concluded that the District Court
had made no such finding.   For the reasons indicated above, I do
not agree.   In any event, I presume that the Court of Appeals, had
it confronted such a finding, would have determined that it was
clearly erroneous.

the consolidation.[20]   When the option was executed, Occidental's attorney was authorized to vote Occidental's Old Kern shares in favor of the Tenneco acquisition, and it was not until it was apparent that Occidental's vote was not needed that Occidental's attorney was relieved of his obligation.   Occidental also abandoned its demand for two seats on Old Kern's board, as well as its litigation for inspection of Old Kern's books and records.

In concluding that this case was not controlled by *Bershad,* the Court of Appeals emphasized the undisputed testimony [21] that the forfeitable down payment was a reasonable, noncoercive price.   The basis for this was the deposition of one of Occidental's vice presidents stating that a New York investment firm had advised him that $9 to $12 per share was a reasonable premium for an option on stock selling at $95.   This deposition should not suffice to support summary judgment.   First, it is not clear what assumptions the investment firm had made in giving this advice.   Second, while it may be that $10 per share premium was a reasonable price for an option based upon factors available to the general investing public, it is by no means clear that an option

---

[20] Respondent argues that, unlike *Bershad,* the effective exercise price was not below the current market value because the Old Kern shares never sold for more than $94.75.   It contends that this trading price reflected the Kern board's acceptance of the proposed consolidation.   But, it is common for a stock which may be exchanged to sell at a discount from the stock to be received until the exchange becomes a certainty.   This discount reflects the risk that the exchange may not be consummated.   The option agreement provided that the premium would be returned if there were no exchange.   Thus, we must appraise this transaction on the assumption that the consolidation would be approved and accomplished.

[21] Petitioner contends here that it did not believe that it was necessary to rebut this hearsay testimony in order to prevail on its motion for summary judgment; moreover, it was not faced with a cross-motion.

executed by two parties privy to inside information should be judged on the same terms.[22]   It may be that under the circumstances present here the eventual exercise of the option was a "sure thing."   In short, Occidental may have known that it was "locked into" a $17 million profit.[23]   Finally, it has not been determined what effect, if any, the very size of the down payment—nearly $9 million—had on the eventual exercise.   With these uncertainties and in view of the holding of the District Court that the option agreement constituted a sale, at the very least the case should have been remanded to the District Court for a hearing on whether the terms of the option "compelled" its exercise.   See *Mourning* v. *Family Publications Service, Inc., ante,* p. 356, at 383 (DOUGLAS, J., dissenting); *White Motor Co.* v. *United States,* 372 U. S. 253, 263; 6 J. Moore, Federal Practice ¶ 56.12, p. 2243 (2d ed. 1972).

---

[22] Although Occidental may not have been Tenneco's "ally," as the majority indicates, it was in their mutual interest to arrange for a satisfactory option agreement.

[23] Shortly after the option was exercised, Armand Hammer, the President of Occidental, commented on the profit of $17 million that Occidental expected.   In his mind, it was "not bad for two weeks' work."