Betty L. GOLD, on behalf of the Susquehanna corporation, Appellee,

v.

Arthur W. SLOAN and Glenn L. Sloane, Appellants,

Securities and Exchange Commission, Amicus Curiae.

Betty L. GOLD, on behalf of the Susquehanna corporation, Appellant,

v.

Keith E. RUMBEL, Appellee,

Securities and Exchange Commission, Amicus Curiae.

Betty L. GOLD, on behalf of the Susquehanna corporation, Appellee,

v.

Arch C. SCURLOCK, Appellant,

Securities and Exchange Commission, Amicus Curiae.

Nos. 71-2180 to 71-2182.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1972.

Decided Oct. 19, 1973.

For Opinion On Petition for Rehearing En Banc Feb. 1, 1974. See 491 F.2d 729.

Charles S. Rhyne, Washington, D. C. (Courts Oulahan, David M. Dixon, Robert H. Culp, and Rhyne & Rhyne, and Edmund D. Campbell, and Douglas, Obear, & Campbell, Washington, D. C., on brief), for appellants in No. 71–2180.

Joseph B. Gildenhorn, Washington, D. C. (Sidney B. Silverman, New York City, Ewell G. Moore, Jr., Fairfax, Va., on brief), for appellee in No. 71–2180, for appellant in No. 71–2181, and appellee in No. 71–2182.

C. Roger Nelson, Washington, D. C. (Franklin M. Schultz, Stephen L. Parker, and Purcell & Nelson, Washington, D. C. and William W. Koontz and Boothe, Pritchard, & Dudley, Alexandria, Va., on brief), for appellant in No. 71–2182.

Jack L. Lewis, Washington, D. C. (John M. Gray, Robert B. Hirsch, David M. Osnos, and Arent, Fox, Kintner, Plotkin & Kahn, and A. Francis Vitt, Jr., Washington, D. C., on brief), for appellee in No. 71–2181.

G. Bradford Cook, Gen. Counsel, Walter P. North, Associate Gen. Counsel, Jacob H. Stillman, Asst. Gen. Counsel, Frederick L. White, Atty., S.E.C., on brief, for amicus curiae.

Before BOREMAN, Senior Circuit Judge, and WINTER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

Betty L. Gold as a stockholder of The Susquehanna Corporation (hereinafter referred to as Susquehanna) sues to recover under Section 16(b) of the Securities Exchange Act profits allegedly realized by certain "insiders" from sales on the open market of shares of Susquehanna preferred stock issued to them as stockholders in connection with the merger of Atlantic Research Corporation (hereinafter referred to as ARC) into Susquehanna.[1] All of the defendants had acquired their ARC stock prior to 1967. In fact, the two most directly concerned, Scurlock and Sloan, had not purchased any stock later than 1962 or 1963. Both the defendant Scurlock and the defendant Sloan were directors and owners of more than ten per cent of the equity stock of ARC. In addition, Sloan was the chairman of the board and chief executive officer of ARC during the merger negotiations involved in this proceeding. The other two defendants were not directors but were at the time vice-presidents either of ARC or one of its subsidiaries, and continued for a time in a like capacity with Susquehanna after the merger. Although all the defendants had acquired their stock in ARC more than six months before either there was an agreement to merge or the

actual effective date of the merger, their sales which represent the basis for this action occurred less than six months after the effective date of the merger. The only issue in the cases is whether the exchange by the defendants of their ARC stock for Susquehanna stock pursuant to the merger constituted a "purchase" within the terms of the Act as of the effective date of the merger so as to establish a starting date for measuring the six-month period between purchase and sale of stock by the several defendants. The District Court found that it did, 324 F.Supp. 1211. We reverse in part and affirm in part.

I.

These actions are predicated on Section 16(b) of the Securities Exchange Act,[2] which provides that any profits realized by a statutorily defined corporate "insider" from "any purchase and sale" or "any sale and purchase" of any equity security of his corporation within a period of less than six months are recoverable by or on behalf of the corporation. A corporate "insider" is defined in the Act as any "person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of an equity security" of his issuer "or who is a director or an officer of the issuer * * *."[3] The purpose of the statute was to take "the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great" and to prevent the use by "insiders" of confidential information, accessible because of one's corporate position or status, in speculative trading in the securities of one's corporation for personal profit.[4]

---

1. Jurisdiction of the action was had under Sections 78p(b) and 78(aa), 15 U.S.C.

2. 15 U.S.C. § 78p(b), Securities Exchange Act of 1934 § 16(b).

3. 15 U.S.C. § 78p(a).

4. Reliance Electric Co. v. Emerson Electric Co. (1972) 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575, reh. denied 405 U.S. 969, 92 S.Ct. 1162, 31 L.Ed.2d 244. See, also, Adler v. Klawans (2nd Cir. 1959) 267

F.2d 840, 844, in which Chief Justice Burger, then sitting as Circuit Judge, stated that the intent of the statute was to prevent "insiders" "from making private and gainful use of information acquired by them by virtue of their official relationship to a corporation. The objective was not to punish but to deter the persons in these three categories—directors, officers, 10% beneficial owners—from making improper use of information gained in a representative capacity."

No difficulty has been experienced in applying the statute and what has been described as its "crude rule of thumb" [5] to the "traditional cash-for-stock transactions that result in a purchase and sale or a sale and purchase within the six-month, statutory period * * *." [6] The right of recovery in such a situation is plain. The real problem for the courts in construing the statute, however, has arisen in connection with the "unorthodox" transaction,[7] one in which the statutory concept of "purchase" and "sale" is blurred and where its identification within such concept is "borderline." [8] Included among these "unorthodox" situations is an exchange of stock pursuant to a corporate merger, as in these cases. A judicial conflict developed over how to deal with such transactions under the statute. Kern County Land Co. v. Occidental Petroleum Corp., *supra,* however, resolved this conflict and adopted what had earlier been described as a "pragmatic rather than technical" test,[9] under which "purposeless harshness" [10] in the enforcement was to be avoided and the application of the statute was to be confined to situations where "its application would serve its goals" and where *"the particu-*

*lar type of transaction involved is one that gives rise to speculative abuse"* and "may serve as a vehicle for the evil which Congress sought to prevent * * *." [11] The focus of the court's attention in such situation, in other words, is limited to the negotiations leading up to and including the finalization of the unorthodox transaction itself, which is the one transaction in question. What the Court held in *Kern County* was not "that an exchange of stock pursuant to a merger may never result in § 16(b) liability." [12] It adopted no such automatic rule. What it did was to establish a sensible and flexible rule, which requires as a basis for statutory liability that *the specific transaction* itself, which constitutes the unorthodox transaction, present the possibility of, or potential for, exploitation of insider information.[13] It held that if there is in the transaction itself, and the negotiations leading up to it, an absence of such possibility of abuse, then the deterrent force of the statute is unnecessary and liability is not in order.[14] The issue is not whether there was "actual abuse of insider information" or "intent to profit on the basis of such information." These considerations are irrelevant.[15] It

5. *See,* Abrams v. Occidental Petroleum Corporation (2nd Cir. 1971) 450 F.2d 157, 162, aff'd. sub nom. Kern County Land Co. v. Occidental Petroleum Corp. (1973) 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503.

6. Kern County Land Co. v. Occidental Petroleum Corp. (1973) 411 U.S. 582, at 93 S.Ct. 1736, at 36 L.Ed.2d 503.

7. This description of the transactions as "unorthodox" originated in the decisions arising under 16(b) in Newmark v. RKO General, Inc. (2nd Cir. 1970) 425 F.2d 348, 351, cert. denied 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91, reh. denied 400 U.S. 920, 91 S.Ct. 172, 27 L.Ed.2d 161.

8. *See,* Kern County Land Co. v. Occidental Petroleum Corp., *supra:* "The statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a. sale or purchase." 411 U.S. at 593, 93 S.Ct. at 1744.

9. Ferraiolo v. Newman (6th Cir. 1958) 259 F.2d 342, 344.

10. Blau v. Max Factor & Company (9th Cir. 1965) 342 F.2d 304, 307.

11. Kern County Land Co. v. Occidental Petroleum Corp., supra, 411 U.S. at 594, 93 S. Ct. at 1744.

12. *Ibid.,* at 600, 93 S.Ct. at 1747.

13. *Cf.,* Note, Reliance Electric and 16(b) Litigation: A Return to the Objective Approach? 58 Va.L.Rev. 907, 915 (1972):
   "If Section 16(b) is to reach a vast range of unorthodox stock exchanges it should do so flexibly."

14. *Cf.,* Blau v. Lamb (2nd Cir. 1966) 363 F. 2d 507, 519, in which the Court said that the underlying purpose of the statute "provides no reason for the application of Section 16(b) to a transaction that poses no danger whatever of insider abuse."

15. Kern County Land Co. v. Occidental Petroleum Corp., *supra,* 411 U.S. at 595, 93 S. Ct. at 1745.
   *See, also,* Adler v. Klawans, *supra,* at 845 of 267 F.2d; Blau v. Max Factor & Company, *supra,* at 307, n. 6 of 342 F.2d.

is specifically whether the defendant "had or was likely to have access to inside information, * * * so as to afford it [or him] an opportunity to reap speculative, short-swing profits" from the unorthodox transaction.[16]

It follows, in summary, that, in cases involving exchanges of stock pursuant to a merger such as here, there is no automatic rule that an exchange is or is not a "purchase" but each transaction must be adjudged on its own particular facts [17] and in the light of the evil which Congress sought by the statute to prevent.[18] This is particularly true in a case like the present one, where there are a number of defendants and their situations are manifestly different.

It will accordingly be necessary to consider individually the situation of each defendant and determine whether the finding by the District Court that there was such a possibility of abuse of inside information on the part of the individual defendant in connection with the merger is supportable. Of course, the findings of the District Court on this issue are to be sustained unless clearly erroneous.

We shall accordingly proceed to examine the particular situation of each defendant as it relates to the merger in question, beginning with the defendant Scurlock.

## SCURLOCK

### II.

The defendant Scurlock, along with his co-defendant Arthur Sloan, founded ARC in 1949 and was its president and chief executive officer from that time until November, 1962. He was then removed as president and chief executive officer of the corporation and was given the title of chairman of the board. At the same time the board created the position of Chief Executive Officer, elected Sloan to the position, and declared the office of president vacant. By 1965 Scurlock and Sloan had apparently developed sharp differences, which had been growing since Scurlock's removal as chief executive officer in 1962. Scurlock, no doubt piqued by his removal, organized a proxy fight for the purpose of replacing Sloan as Chief Executive Officer at the annual stockholders' meeting in July, 1965. In the meantime, there had been some public distribution of the corporation's stock; and, while originally Sloan had owned sixty per cent of the corporate stock and Scurlock forty per cent, Sloan's ownership had been reduced to about seventeen per cent and Scurlock's to something like twenty per cent by 1965. At the stockholders' meeting in July, 1965 Sloan and his management slate received the vote of approximately two-thirds of the stock voting and thereupon took undisputed control of ARC from that time forward. Scurlock did retain membership on the board but only because cumulative voting enabled him to do so. From this point on he was simply a disaffected stockholder and powerless director, tolerated but not welcomed by the management. In each subsequent management proxy issued for the annual stockholders' meeting, the management was careful to state that Scurlock was not on the management slate for election as a director but would probably utilize the mechanics of cumulative voting to retain membership on the board, which Scurlock consistently did. As was to be expected in such a situation, Scurlock, both as stockholder and director, was in frequent disagreement and contention with the manage-

16. Kern County Land Co. v. Occidental Petroleum Corp., *supra*, at 596, 93 S.Ct. at 1745.

17. *See*, Petteys v. Butler (8th Cir. 1966) 367 F.2d 528, 533, cert. denied, 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 545, where, in speaking of an "unorthodox" transaction in a § 16(b) case, the Court said:

"We believe that each case must be examined on its own facts and the Act only applied when these facts disclose the possibility of abuses that the Act were designed to prevent."

18. Ferraiolo v. Newman, *supra*, at 344 of 259 F.2d.

ment all during this period. In fact, he was engaged in litigation with the corporation, seeking to restrain the management from acquiring another corporation, on the very eve of the approval of the merger with Susquehanna by the board on August 2, 1967.

For some time interest had been developing on the part of several corporations looking to acquiring by merger ARC. Negotiations began with a number of such merger suitors, among them Susquehanna. All merger negotiations with Susquehanna were conducted at either the offices of ARC or the offices of company counsel, Charles Rhyne, exclusively by Sloan, its chief executive officer, Rice, its president, and Crowley, its secretary, on behalf of ARC. Scurlock was not privy to any of these negotiations, and was not consulted individually or independently by the management either as a stockholder or as a director, with respect to any of the negotiations.

On July 11, 1967 the management distributed to the ARC stockholders a "supplement to the management proxy statement," prepared in advance of the annual stockholders' meeting for that year. This set forth in considerable detail the negotiations that had been had by the management with prospective merger partners. It recited that on July 3, 1967 an "agreement in principle" had been reached "between officers of Atlantic Research Corporation and officers of Ogden Corporation relative to" a merger. The use of the term "officers" in the statement is significant and was seemingly used to emphasize that the members of ARC's board who were not "officers" had had no part in the negotiations. The notice proceeded then to advise stockholders that since July 3 three other corporations had indicated an interest in merging with ARC. All four of the proposals for merger, including that of Susquehanna, were then detailed for the information of the stockholders. Sloan and Rice, ARC's president, stated in the supplemental proxy notice that they favored merger with

Ogden, with whom they would be associated if the merger were approved.

On July 20, prior to the stockholders' meeting on July 28, the directors of ARC met and rejected Ogden's July 3 offer because the value of the other offers was deemed of greater value than that of Ogden's offer as estimated by the ARC management. The management, on that same date, gave notice of its action in rejecting Ogden's offer and then set forth the value of the offers submitted by the other merger suitors. The value assigned to the Susquehanna offer was $36 per ARC share. This notice stated, also, that Goldman, Sachs & Company would analyze the several offers, which would be considered at a special meeting of the board of directors on August 2. On July 28 Goldman, Sachs prepared and presumably delivered to the management of ARC "the essential details of the various proposals" made ARC. This was not a recommendation in favor of any proposal but merely a compilation of statistical financial information relating to each company, taken apparently from its annual report. The record suggests that distribution of this document did not go beyond the management negotiation team. Goldman, Sachs, by letter dated August 1, made its recommendation that the offer of Susquehanna be accepted. This letter was not distributed to the directors generally by Sloan until the directors' meeting on August 2. Scurlock testified that he was not approached about Susquehanna's offer until about an hour before the directors' meeting when Korholz, attending the meeting on behalf of Susquehanna, sought to secure from Scurlock an agreement to support Susquehanna's offer to merge.

When the directors' meeting began on August 2 it was obvious that there was considerable disagreement over which of the several offers to accept. The president and two other directors of ARC were so opposed to a merger with Susquehanna that they offered their resignations in the event it was approved. It

is manifest, therefore, that the approval of the merger with Susquehanna was by no means a foregone conclusion; indeed, it was finally effected by a four-to-three vote of the directors. All stockholders were immediately advised of the action taken. A proxy statement, covering the merger, was prepared and distributed to all stockholders of both ARC and Susquehanna, and at stockholders' meetings called by both corporations the merger was duly approved and became effective on December 4, 1967. Between December 20, 1967 and January 17, 1968, following the consummation of the merger, Scurlock sold 36,000 shares from his original holdings of 380,070 shares of preferred Susquehanna stock received in the merger. These sales represent the basis of the claim against Scurlock.

Unlike the situation in *Newmark*, cited by the plaintiff, Scurlock was not, as we have seen, in control of, or a participant in, the merger negotiations. While a nominal director of ARC he was as removed from the actual negotiations between ARC and Susquehanna and was as much of an outsider looking on as was Occidental in *Kern County*. He did know Susquehanna was interested in a merger with ARC but, until the notice that the "management" gave the stockholders on July 11, he was as ignorant of the actual terms offered by Susquehanna as every other stockholder, despite the fact that he was a nominal director, albeit an unwelcome one. When the notice of July 11 gave him substantial information on Susquehanna's offer, it gave all other stockholders the identical information. He acquired no potential for any abuse of insider information. Moreover, until the directors' meeting on August 2 he had no prior understanding or conferences with other directors, so far as the record

shows, and he had no more reason to know whether the offer of Susquehanna would be accepted or rejected than any other stockholder. As we have seen, the action of the board in approving Susquehanna's offer was no formal matter; it remained in doubt until the vote of the directors was taken. And as soon as the directors acted, public announcement was made. Thereafter a full proxy statement was prepared and given all stockholders and stockholder approval was had. It is true Scurlock voted for the merger but so for all practical purposes did Occidental in *Kern County*.[18a] In any event, Scurlock certainly did not have independent control over the merger's outcome; he had no more control than the other three directors who voted for its approval. More important Scurlock possessed no knowledge that might have helped him speculate in Susquehanna's stock. The point is that at no time did Scurlock have an opportunity to exploit any insider information. He was never favored by Sloan over any other stockholder in information on the proposed merger. The full details of the offer of Susquehanna were given all stockholders by the management proxy statement of July 11, several weeks before the directors' meeting on August 2, and it was this same proxy statement which for the first time gave Scurlock knowledge of the specific details of Susquehanna's offer. He thus had no opportunity over and above that of any other stockholder to take advantage of any "advance knowledge of information that would produce a rise in the market price" of ARC stock or of Susquehanna stock; and, while it is irrelevant to this controversy, it is of interest that Scurlock had not bought a share of ARC stock since 1962. *Cf.*, Blau v. Lamb, *supra*, 363 F.2d at 514.

18a. It is true Occidental did not vote in favor of the merger with Tenneco in the *Kern County* case and a failure to vote, under California law, is deemed a negative vote. But Occidental was not opposed, as a practical matter, to the merger. Actually, its agreement with Tenneco, which constituted the very basis of the action in that case, was predicated upon the assumption that the merger would be approved. Occidental was thus not indifferent, much less opposed, to the merger in fact. It was as much interested in the merger as Scurlock was in this case.

He participated in the merger on exactly the same basis as all other stockholders. *Cf.,* Roberts v. Eaton (2nd Cir. 1954) 212 F.2d 82, 85, cert. denied 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652.[19]

Under these circumstances, a finding of a want on the part of Scurlock of a possibility of gainful private exploitation of confidential inside information, acquired in his capacity as director, was, it would seem, compelled by the undisputed facts. The District Court found, however, that there had been the possibility of abuse on the part of Scurlock. It based this finding upon the assumption that the July 31 letter or memorandum of Korholz, chairman of the Susquehanna board, in which the latter summarized the terms of Susquehanna's offer, was received by the "directors" on July 31 and that "[T]he defendants [meaning specifically Scurlock as well as Sloan] were aware on July 31, 1967 (Monday) of the market value of preferred stock SC would issue in exchange for their ARC common," and had the opportunity to speculate in ARC stock on the basis of inside information between that date and August 2 when public announcement of the actual offer was made. There are two difficulties presented by this finding. First, the letter was addressed to and was received by Sloan, not by the directors of the corporation, and the minutes of the meeting of the board on August 2 show that it was not until that meeting itself that the letter was distributed among and made known to the directors generally, including Scurlock. What the District Court has done is to disregard the clearly established difference in the positions of Sloan and Scurlock in the negotiations and the sharp difference in information possessed by the two. Sloan was in charge of the negotiations; Scurlock was strictly excluded. It is plain error to jumble the two in determining opportunity for abuse and to hold that a letter written to Sloan and presumably received by him, was immediately made known to Scurlock. Sloan, by his testimony, showed that he was carefully restricting the negotiations to a limited circle of three individuals, at most, and this circle very definitely did not include Scurlock. The plaintiff, in her argument in this Court, falls into the same error and seeks to equate Scurlock's participation in the merger and inside knowledge of the progress of negotiations with that of Sloan. She states in her memorandum, for instance, that "Scurlock and Sloan participated in discussions and negotiations for the Susquehanna merger." Such statement is flatly in contradiction of Sloan's undisputed testimony that all negotiations with Susquehanna were conducted by him, Rice and Crowley on behalf of ARC and always in the offices of either ARC or the corporation's attorney Rhyne. Sloan and Scurlock had no conferences, exchanged no views, had no consultations in connection either with the Susquehanna negotiations or with those carried on with any other party. It is true that Scurlock knew that Susquehanna was interested in merging with ARC. Korholz, who in some way seems to have come in possession of the knowledge that Scurlock had a large outstanding loan that the latter was anxious to refinance, agreed in 1966 to secure for Scurlock such refinancing. Korholz indicated at the same time that he was seeking to purchase Sloan's stock and, if successful would like to buy 100,000 shares of Scurlock's stock at the same price he paid Sloan. He requested and Scurlock

19. " * * * Thus the validity of the distinction based upon the option to the individual has been seriously questioned where an insider controls and can work his will through the board of directors. See Park & Tilford v. Schulte, supra, 2 Cir., 160 F. 2d [984] at page 988. But the objection loses some of its force where, as here, time-consuming ratification by the stockholders was required, and not only the acquisition, but the proposed subsequent sale, was fully disclosed. Nor can it be gainsaid that like treatment of all stockholders will in most cases remove the possibility of abuse." (212 F.2d at 85)

agreed that if this were done, and Korholz bought 100,000 shares of his stock, he would "support a merger of Atlantic with Susquehanna Corporation * * * on a basis which is fair to Atlantic and Susquehanna shareholders." It is obvious that this represented no discussion of terms of merger beyond the nebulous phrase regarding a "fair" basis. This agreement lapsed and there were no other discussions for many months until the morning of August 2 when, some hour before the directors' meeting, Korholz requested Scurlock's support. It was natural that because of the latter's large stock interest Korholz would seek Scurlock's support of Susquehanna's offer, but this was after the terms of the proposed merger with Susquehanna had been negotiated with Sloan, had been informally disclosed to all stockholders on July 11, had been given a market value in the public announcement of July 20 and had been set forth in a written and final form in the letter of July 31 to Sloan. And even at this time it is not suggested in the record that Korholz showed Scurlock a copy of his letter of July 31 to Sloan. There is thus no basis in the record for assuming, as the District Court did, that a letter written by Korholz to Sloan placed Scurlock in any position to use information in that letter for his private profit.

There is another equally powerful reason the letter of July 31 could not have put Scurlock in possession of any "inside" information that he could possibly have exploited. That letter did not include a single detail that had not already been provided stockholders generally. The public announcement made by the ARC management on July 20 gave the estimated market value of the Susquehanna offer. Korholz's letter of July 31 merely re-stated this value, made public some ten days earlier. The plaintiff, in her argument in this Court, has recognized this error in the District Court's reasoning and, in an effort to shore it up, urges that, though there was a public announcement on July 20 that gave the estimated market value of the Sus-

quehanna offer, that announcement was inadequate and failed to provide stockholders with essential information which presumably was available in Korholz's letter of July 31 and without which, as plaintiff asserts, no "prudent businessman" could have "intelligently acted in reliance on." Korholz's letter, however, was short and summarized in a single sheet the bare outlines of Susquehanna's offer. But—and this is the important fact which the plaintiff would gloss over and that apparently the District Court overlooked—every detail that the plaintiff contends should have been included in the public announcement of July 20 had been set forth with precision in the earlier supplemental proxy statement of July 11. Thus, the plaintiff complains that the stockholders did not know whether the Susquehanna offer was "for cash or for securities," did not know "the type of security" offered, if the offer was in the form of "securities," did not know the "dividend terms" of such securities, and whether they were "callable" and "at what price" and, finally, did not know "whether there was any intention to list any new security on a national stock exchange." As already observed, in making this argument the plaintiff would pass over the fact that the press release related back to the supplemental proxy statement and simply sought to place a value on the several offers described in that proxy notice. In the proxy notice of July 11 the proposal of Susquehanna was stated with all the specific details which the plaintiff argues had not been made available to outside stockholders prior to the directors' meeting of August 2. As described in this proxy statement, the proposal contemplated an exchange of securities, described as "one share of ten-year Convertible Preferred Stock for each share of Atlantic Research Common Stock." The dividend to be provided on that stock was a "cumulative" $1 per share annually. The stock was callable "at $40 per share during the ten years." The proxy notice, also, stated that "Subsehanna intends to apply for listing of

both the Susquehanna Common Stock and the above mentioned Preferred Stock on the New York Stock Exchange after consummation of the proposed combination * * *." It is thus evident that the very precision that the plaintiff claims any "prudent businessman" would have required was given in this proxy notice to all stockholders and received in the same way by Scurlock and all the other outside stockholders. Moreover, these terms were substantially the same as the terms outlined in the one-page letter written Sloan by Korholz on July 31, changed only to make the preferred stock offered non-callable for the first five years, and making a slight variation in liquidation value if the liquidation were voluntary or involuntary. And the actual stock exchange by Susquehanna conformed to this information, with the two slight changes suggested, it would seem by Goldman, Sachs, who were used by Sloan as financial advisers to ARC in the transaction.

The plaintiff suggests, however, that after the merger, Scurlock became a director of Susquehanna and, like Sloan, was "privy to inside information." Again, plaintiff would confuse the positions of Sloan and Scurlock in the new company. Sloan was the chairman of the board and chief executive officer of that company. Scurlock was again an "outside" stockholder, holding no office and plainly enjoying no confidences of Sloan or the corporation. In addition, a proxy statement had been prepared in connection with the merger. That proxy statement gave complete information both on Susquehanna as it existed before the merger and as it was expected to be after the merger. This was available to all stockholders of the old ARC as well as to all stockholders of Susquehanna. After all, it is the unfair use of inside information against which the statute is directed and plainly where there has been full disclosure, as is given by a proxy statement, the potential for unfairness and any basis for invoking the statute disappears.[20] There was such disclosure here, as far as Scurlock was concerned. Finally, and more conclusive, this argument would make the determination whether an exchange pursuant to merger was a "purchase" within the Act to depend not on the basis of facts and circumstances prior to or at the time of the merger, but on possible abuse of inside information *after the merger*. Such argument misconstrues the scope of the "possibility of abuse" test and confuses the analogy to be drawn from the Supreme Court's analysis in *Kern County*. The "possibility of abuse" test applies only to one transaction, the exchange of stock pursuant to a merger. The merger was the beginning transaction in the case under review; in the *Kern County* case, it was the closing or ending transaction. Whether the transaction constituted a "purchase" in this case or a "sale" in *Kern County* was, in each case, the single disputed issue; in resolving such single issue, nothing that took place after the merger was considered in *Kern County,* and by like token nothing occurring after the merger should be considered in this case: circumstances or events occurring after the transaction in question cannot possibly be relevant in determining whether there was a possibility of speculative abuse when such transaction occurred (except insofar as such subsequent events reveal the extent of prior knowledge). The merger is the cut-off date in both cases for determining whether there has been an opportunity for speculative abuse of inside information.

In this case, the issue is whether the acquisition of Susquehanna stock by ARC stockholders in exchange for their ARC stock represented a *purchase* of Susquehanna stock. If it did, the subsequent sales within six months fell "within the ambit" of 16(b). In the *Kern County* case, on the other hand, the is-

**20.** Newmark v. RKO General, Inc., *supra*, 425 F.2d 348; *cf.*, 84 Harv.L.Rev. 1018 (1971).

sue was whether the disposition of Old Kern stock by Occidental in exchange for Tenneco stock, pursuant to the Old Kern-Tenneco merger, was a *sale* of Old Kern stock. If it was, then that sale was made within six months after Occidental purchased its Old Kern stock and would have incurred 16(b) liability. Thus it is clear why the Supreme Court *did* look to the entire period encompassed by the short-swing transactions. Such investigation was not for the purpose of determining whether the stock purchases by Occidental constituted "purchases" under 16(b); statutory purchases were admitted. Rather, the Court had to decide "whether a 'sale' within the ambit of the statute took place * * *." [21] The plaintiff had alleged that Occidental, "as a sophisticated corporation knowledgeable in matters of corporate affairs and finance, knew that its tender offer would either succeed or would be met with a 'defensive merger' ".[22] In other words, it was alleged that Occidental possessed certain inside knowledge of Old Kern's affairs indicating that a profit could be made from the ultimate disposition of Old Kern stock. Therefore, the Court had to consider all circumstances and facts leading up to such disposition (i. e., the merger) in order to determine whether, at the time of the merger, Occidental had the requisite knowledge which, in fact, would have met the "possibility of abuse" test. Such consideration of prior circumstances was not for the purpose of evaluating the opening event, which was not at issue. It should perhaps be added that, if any such manipulation occurred after merger, it was clearly redressable under Section 10(b), as enforced under the rules of the Securities Exchange Commission.[23]

The plaintiff argued further in her brief that Scurlock could have aborted the merger by opposing it and demanding dissenter's appraisal rights and that this made him liable in this action. It is true under the strict language of the merger agreement the dissent by Scurlock would have given Susquehanna an opportunity to abandon the merger, but the practical disadvantages of such a dissent by Scurlock appear so obvious as to have made unrealistic any assumption that he might have done so. Moreover, it must be remembered that Scurlock in the proxy statement issued in connection with the proposed merger was committed as a stockholder to vote for the merger at the approaching stockholders' meeting. He had thus tied his hands by this commitment in the proxy statement and eliminated any possibility of aborting the merger by a dissenting vote on his part. Indeed, it is quite possible that Scurlock would have made himself liable to other stockholders had he, after his representation in the proxy statement, reversed his position.

On a consideration of the entire record, we are convinced for the reasons already stated, that the finding of the District Court that the delivery of the letter of July 31, 1967 written by Korholz to Sloan, presented an opportunity on the part of the defendant Scurlock "for abuse, which Section 16(b) was designed to prevent" and rendered his exchange of stock pursuant to the merger on December 4, 1967 a "purchase", was clearly erroneous. We are equally convinced that there is no other reasonable basis for finding liability against the defendant Scurlock in connection with the challenged transactions. Accordingly, the judgment of the District Court against the defendant Scurlock is vacat-

21. Kern County Land Co. v. Occidental Petroleum Corp., *supra*, 411 U.S. at 595, 93 S. Ct. at 1745.

22. Kern County Land Co. v. Occidental Petroleum Corp., *supra*, at 597, 93 S.Ct. at 1746.

23. *See*, Note, Reliance Electric and 16(b) Litigation: A Return to the Objective Approach?, *supra* (cited in *Kern County*, at 594 n. 26, 93 S.Ct. at 1745), in which the author makes the criticism that in some decisions 16(b) had "grown to resemble a general, anti-fraud provision rather than the simple, mechanical, and limited prophylactic against insider trading that Congress intended" (58 Va.L.Rev. at 907).

ed and, on remand, the District Court is directed to enter judgment herein in favor of the defendant Scurlock.

### III.

### RUMBEL AND GLENN L. SLOANE

■ The defendants Rumbel and Glenn L. Sloane were officers of ARC and subsequently of Susquehanna. Both, however, were in the lower management hierarchy. Neither had the slightest connection with the merger negotiations conducted by Sloan and his associates and were as ignorant of merger developments as any outside stockholder. The District Court found specifically that "there was no evidence indicating * * * Sloane had an opportunity to avail" himself of any inside information relating to the merger. It reached a similar conclusion about Rumbel but found, in addition, that his title as an officer was "merely titular" and was ineffective to clothe him with the reality of an officer.[24] Because of the finding that Rumbel's title was purely "titular" and not real, the District Court absolved him of any liability but, finding that Sloane was an officer of both ARC and, later, of the merged corporation within the intendment of the Act, it imposed liability on Sloane. In short, the District Court, adopting the "objective test" which was later disapproved by the Supreme Court in *Kern County*, fixed liability on Sloane as if his transaction had been what Judge Friendly described in the Circuit Court opinion in *Kern County* as simply "a garden-variety purchase and sale."[25] Whether Sloane's exchange of stock pursuant to the merger represented a "purchase", which was the key issue in connection with his liability, was, however, determinable, not by the "mechanistic" formula provided by the "objective test", as

employed by the District Court, but by the rule of "possible opportunity for abuse." And when the District Court found, as the evidence clearly warranted, that Sloane had no such opportunity, a conclusion of nonliability on Sloane's part necessarily followed. Since there was a similar finding of lack of "possible opportunity for abuse" of inside information by Rumbel, based on ample evidence in the record, Rumbel, also, was entitled to judgment in his favor, and the District Court properly so ruled, even though it placed its holding on another ground, the correctness of which we find no need to examine. Accordingly, the judgment of the District Court finding the defendant Rumbel not liable is affirmed, and the judgment entered against the defendant Sloane is vacated, and on remand the District Court is directed to enter judgment in his favor.

### IV.

### SLOAN

■ Sloan occupies an entirely different position from any of the other defendants. He was at all times when merger discussions or negotiations were under consideration the chief executive officer of ARC. As such, he was in possession of a comprehensive knowledge of the financial condition of ARC and its prospects. When merger possibilities began to be considered, he was in complete charge of the negotiations on behalf of ARC. All initial discussions with any of the merger suitors were under his control, so far as ARC was concerned. Nor was this all. He seems to have conducted extensive investigations into the financial condition and prospects of the merger candidates; at least, he admittedly did so in connection with Susquehanna's offer. He testified that, through an employee who reported to him, he had "access to the books and

24. Colby v. Klune (2nd Cir. 1949) 178 F.2d 872, 873; Ellerin v. Massachusetts Mutual Life Insurance Co. (2nd Cir. 1959) 270 F.2d 259, 265; cf., Reliance Electric Co. v. Emerson Electric Co., *supra*, 404 U.S. at 424, n. 4, 92 S.Ct. 596.

25. Abrams v. Occidental Petroleum Corporation, *supra*, 450 F.2d at 162.

records of Susquehanna during this period." He personally made an examination of the plants and equipment of Susquehanna. He selected ARC's financial adviser in the merger negotiations and was the responsible officer who consulted with that adviser. It is true that in the proxy notice of July 11 Sloan, acting on behalf of the management, gave a precise statement of the contractual terms of the proposed merger with Susquehanna, but he did not provide stockholders with the results of his review of the books and records of Susquehanna or of his inspection of its plants. Nor, for that matter, do the minutes of the directors' meeting on August 2 indicate that he gave the directors any information along this line. It was not until the proxy statement required under the merger agreement was distributed to stockholders on or about October 26, 1967 that any financial information relating to Susquehanna was given the stockholders of ARC. From the directors' meeting of August 2 to October 26 Sloan had every reason to feel assured the merger would be approved. During this same period, when stockholders generally were uninformed about Susquehanna and its financial condition and prospects, Sloan was in possession of information secured by an examination of Susquehanna's records and inspection of its plants that gave him superior knowledge about the financial condition of Susquehanna and its prospects. He thus did have an opportunity for abuse of inside information. We feel sure that he did not actually use such information for his personal benefit. But liability does not rest on actual abuse; it is the possibility for abuse that supports recovery. It may be harsh to impose liability in such a situation, but the burden of the statute is intentionally harsh. Because of its harshness, as we have seen in *Kern County*, the courts have in "unorthodox transactions," provided immunity to those situations where there was no *possibility* of abuse of inside information but they have preserved it where the circumstances of the merger

give rise to a potential for abuse on the part of an officer or director. Although we are not prepared to agree with the District Court that the mere receipt by Sloan of the memorandum of Korholz dated July 31, prior to the directors' meeting of August 2, a memorandum which in abbreviated form gave the bare details of the offer of Susquehanna as set forth precisely in the proxy statement of July 11, created any possibility of abuse of insider information by Sloan, we do conclude that his prior knowledge of Susquehanna's financial condition and prospects, not communicated to the ARC stockholders until the proxy statement of October 26, 1967 was given them, did provide Sloan with an opportunity for abuse of insider information sufficient to sustain the judgment rendered against him by the District Court.

In summary, the only relevant distinction to be made between Sloan and the other defendants in this case is that Sloan possessed specific financial information concerning ARC and Susquehanna between the date of the August directors' meeting of ARC and the distribution of the proxy statement in October; Sloan, and no other defendant, had knowledge of certain inside information that would have helped him to predict the future performance of Susquehanna stock; such knowledge is the source of his "possibility of speculative abuse"; and because of such possibility of abuse, Sloan's action in exchanging his ARC stock for Susquehanna stock pursuant to the merger is deemed a "purchase" of Susquehanna stock under 16(b). Thus we have the somewhat paradoxical, but unavoidable, situation in which apparently identical transactions made by Sloan and the other defendants are deemed in one case a "purchase" and in the other cases not "purchases". As a matter of law, however, such transactions are not identical. The actual knowledge possessed by an insider at the time of a given "unorthodox transaction" is an essential element to be considered in determining whether a 16(b)

"purchase" has occurrred; the term, "purchase" should be viewed as a legal concept and not strictly according to its dictionary definition. The judgment of the District Court against the defendant Sloan is accordingly affirmed.

## V.

### INTEREST

Defendant Sloan has appealed from the allowance of interest on the judgment granted against him by the District Court and affirmed by us. While the allowance of interest in 16(b) cases usually is discretionary with the Trial Court, the granting of such allowance should not follow as a matter of course. The governing rule is that " * * * 'interest is not recovered according to a rigid theory of compensation for money withheld, but is given in response to considerations of fairness. * * * ' " Blau v. Lehman (1962) 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403. This rule has been followed in recent cases, where interest was not awarded upon the showing of "good faith" on the part of the defendant. Blau v. Lamb (D.C.N.Y.1965) 242 F.Supp. 151, 161; Volk v. Zlotoff (D.C.N.Y.1970) 318 F.Supp. 864, 867; Lewis v. Wells (D.C.N.Y.1971) 325 F.Supp. 382, 387.

In its Memorandum Opinion and Order in this case, the District Court has made no findings on the question of "fairness" but has stated in its Order simply that "interest on the amount of profit is a proper item of damage." Such statement would appear to contradict Blau v. Lehman. Since we are convinced that defendant Sloan did not wilfully violate Section 16(b), and in consideration of the unavoidable length of these proceedings, we believe that it would be inequitable to allow interest charges in this case. Therefore, we reverse the judgment of the District Court on the allowance of interest against Sloan.

### SUMMARY

We accordingly remand with directions (1) that the judgments against the defendants Arch C. Scurlock and Glenn L. Sloane be vacated and the actions dismissed as against them, (2) that the dismissal of the action against the defendant Keith E. Rumbel be affirmed, (3) that the judgment against the defendant Arthur W. Sloan be affirmed, except so much as allows interest in favor of the plaintiff and, as to that item the finding of the District Court is reversed.

WINTER, Circuit Judge (concurring in part and dissenting in part):

I disagree with the majority that Scurlock should be exonerated from liability for short-swing profits realized from the sale of Susquehanna stock. I agree with the majority, although on different grounds, that Rumbel should not be held liable for the profits he realized on the sale of shares of Susquehanna within six months of their acquisition. I agree with the majority, although for different reasons, that Glenn L. Sloane should not be held liable for profits from his stock transactions on the present record, and I would remand for further proceedings. I agree that Arthur W. Sloan should be held liable for his short-swing profits, but again for reasons which differ from those deemed controlling by the majority. Finally, I would vacate the interest award, but, unlike the majority, I would remand this question to the district court for redetermination in the exercise of its discretion. I therefore concur in the judgment in part, and respectfully dissent in part.

### I.

My differences with the majority, except on the issue of interest, stem from my reading of *Kern*. I think that the majority misreads and misapplies its holdings, all to the end that it reaches erroneous conclusions or assigns erroneous reasons for correct conclusions with respect to each of the defendants.

The majority and I are agreed that *Kern* stands for the general proposition that in the case of "unorthodox" trans-

actions, such as mergers, recapitalizations, conversions, etc., the issue of whether such transactions were "purchases" or "sales" within the meaning of § 16(b) is to be resolved by determining "whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." 411 U.S. at 594, 93 S.Ct. at 1744. *Kern* was a case in which the Supreme Court held that the defendant corporation, which had become a ten percent beneficial owner of an issuer by virtue of a cash tender offer take-over bid, had not "sold" its stock in the issuer when it exchanged such stock, pursuant to the terms of a defensive merger arranged by the target issuer with a third company. The Court also held that an option, granted by the defendant corporation to the third company prior to the approval of the merger, to purchase any shares the defendant corporation might receive pursuant to the defensive merger, exercisable after six months, was not a "sale" within the meaning of § 16(b). These holdings resulted from findings that the defendant corporation, because of its antagonistic posture vis-a-vis the issuer's management, had no effective access to inside information concerning the issuer, and that the defendant had no effective control over when or whether the merger transaction asserted to be a "sale" would take place. Thus, there was no possibility of speculative abuse by the defendant of inside information concerning the issuer.

It is at once apparent that in *Kern* the "unorthodox" transaction was a *closing* disposition transaction. It was a merger which was asserted to be a "sale." The instant case is the converse. Here, the unorthodox transaction was an *opening* acquisition transaction, i. e., the merger of Atlantic into Susquehanna, which is asserted to be a "purchase." It was followed by sales of stock within six months thereafter by four individuals having various connections with Atlantic and Susquehanna.

Drawing upon *Kern*—erroneously, as I shall try to demonstrate—the majority, for all practical purposes, limits its inquiry into the possibility that the four individuals may have had access to inside information which would have permitted them to realize short-swing profits to the events and capacities of these individuals *prior* to the effective date of the merger. It deems the possibility of speculative abuse *after* the merger irrelevant, and this is where the majority and I disagree. Of course, in *Kern*, such a limitation was proper because the merger was a closing disposition of the plaintiff-issuer's stock; the defendant ceased to be a statutory insider when the merger was consummated. But, in the instant case the merger was an opening acquisition. The individual defendants could not become statutory insiders until the merger was effective, and it would seem to me that access to inside information and the possibility of speculative abuse within the six months period thereafter would be highly relevant, if not, indeed, crucial. Nothing in the language of the court's opinion in *Kern* requires the limitation adopted by the majority in the present case. The imposition of such a limitation, in my view, proscribes activities that § 16(b) was not intended to reach and leave unattended an evil that is clearly the target of the policy underlying § 16(b).

Section 16(b) was designed to prevent certain classes of persons thought likely to have "inside" information concerning an issuer, i. e., directors and officers of such issuer (if they were officers and directors at the time of either acquisition or sale of securities), or beneficial owners of ten percent of any class of equity security of such issuer (if they were such beneficial owners at both the time of sale and purchase of any equity security), from executing transactions in the securities of such issuer based on inside information. The purpose was sought to be achieved by holding any person who is a statutory "insider" of the issuer accountable to the issuer for profits made by sales and purchases, or

purchases and sales, of securities of the issuer, separated by less than six months *without proof of actual use of inside information.* It is manifest that where the alleged sale or purchase is an "unorthodox" transaction, application of the possibility of speculative abuse of inside information test must be guided by the specific evil the statute seeks to prevent: injury to outsider shareholders *of the issuer,* caused by persons trading in the securities of the issuer who make use of information *concerning the issuer,* obtained by virtue of their status as insiders *with respect to the issuer.*

A finding that the four defendants may have had access to and an opportunity to use information concerning the merger during the period *prior* to consummation of the merger would provide no basis for applying § 16(b) in a suit brought by a Susquehanna stockholder. Any information regarding Susquehanna that they obtained during this period could not have come to them by virtue of any status as a statutory insider of *Susquehanna.* Therefore, other things being equal, § 16(b) should not be applied, since it is not the policy of that provision to prevent persons who are not statutory insiders of the issuer from making speculative abuse of any inside information obtained through some other relationship to the issuer.

Furthermore, it would not appear that the shareholders of Susquehanna—intended beneficiaries of § 16(b)'s protection in a suit predicated on a purchase and sale, or a sale and purchase, of Susquehanna stock—could be injured by the defendants' speculating upon inside information concerning the merger during the pre-merger period. The speculative value of any information concerning Susquehanna that may have become available to defendants during this period inhered in its power to indicate, either directly or indirectly, whether the exchange rate of Susquehanna stock for Atlantic stock was more favorable to Susquehanna or Atlantic shareholders.[1] If the terms were more favorable to Susquehanna shareholders, defendants could profit from this information by liquidating their Atlantic holdings before the merger. If the terms were more favorable to Atlantic stockholders, they could profit, by either retaining or increasing, or both retaining and increasing their Atlantic holdings, prior to the merger. But, in either event, Atlantic's stockholders, *not* Susquehanna's stockholders, would be injured by the use of this inside information. Thus, the majority's concern for defendants' inside information *prior* to consummation of the merger would appear to be implicitly based upon an extension of the protection of § 16(b) beyond that envisioned by Congress.[2]

While the majority cites no authority for the proposition that the consummation of an "unorthodox" opening acquisition is the cutoff point for determining whether such a transaction can lend itself to the abuse sought to be prevented

---

1. Information, not generally available, contained on informal income statements and balance sheets of Susquehanna might directly indicate that the proposed market value of $36.00 per share of the Susquehanna stock to be issued in exchange for Atlantic stock was too high or too low. Information concerning probable future developments, either good or bad, in Susquehanna's post-merger business operations might indirectly indicate that the proposed market value of $36.00 was too high or too low.

2. Of course, defendants might wait until after their merger acquisition of Susquehanna stock to act on their knowledge that such stock was either overvalued or undervalued.

Such a course of action would be likely only if the defendants could be confident that the restricted nature of such information would survive the merger transaction. It is recognized that such post-merger dealing in the issuer's stock would injure the issuer's shareholders. However, it cannot be gainsaid that the majority's approach includes acts injurious to the shareholders of Atlantic among the possibilities of abuse that trigger the application of the statute. Furthermore, it should be reemphasized that in the contingency discussed above, defendants would not have put to speculative advantage information which they gained as statutory insiders of Susquehanna and, hence, § 16(b) should not be deemed applicable.

by the statute, there is some authority that suggests the contrary. In Blau v. Lamb, 363 F.2d 507 (2 Cir. 1966), corporation A acquired from corporation B stock in corporation X in exchange for the surrender of shares in B held by A. Virtually all of the stock of both corporations A and B was owned by Lamb. A shareholder of X sued A under § 16(b), because A had disposed of its stock in X within six months of its acquisition from B. Applying the "possibility of speculative abuse of inside information" test to determine whether the transaction whereby A acquired the X stock from B was a "purchase" within the meaning of § 16(b), the court held the transaction not to be a "purchase" because, in view of Lamb's ownership of both the acquiring and the disposing corporation, "[t]he transfer . . . in no way increased Lamb's power to make use of inside information." 363 F.2d at 526. Clearly, the court looked to the post-transaction situation to determine whether the opening acquisition could serve as a vehicle for the evil which Congress sought to prevent. The majority's approach in this case is unquestionably inconsistent with Blau v. Lamb.

If, contrary to the majority's approach, the situation that obtains after an opening merger acquisition is examined, the possibility of abuses that are within the ambit of § 16(b)'s protective purpose may very well appear. When a defendant becomes an insider of an issuer as part of an opening acquisition of such issuer's stock, such defendant may be able to use information obtained thereafter, by virtue of his insider position, in timing his closing dispositions of the stock. Such an abuse is exactly the sort of evil that § 16(b) is designed to prevent. By the terms of § 16(b), a person who purchases stock of an issuer while not a director, and who later becomes a director of the issuer and sells such stock within six months of purchase, is liable under § 16(b). The statute has been so applied. Adler v. Klawans, 267 F.2d 840 (2 Cir. 1959); Bershad v. Mc-

Donough, 428 F.2d 693 (7 Cir. 1970) (alternative holding); Marquette Cement Manufacturing Co. v. Andreas, 239 F. Supp. 962, 966 (S.D.N.Y.1965); Blau v. Allen, 163 F.Supp. 702 (S.D.N.Y.1958). The statute has also been applied when one was a director when he purchased stock, but sold it after his resignation. Feder v. Martin Marietta Corp., 406 F.2d 260 (2 Cir. 1969), cert. den., 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970). The application of § 16(b) to such cases can be supported only on the theory that the possible use of inside information, acquired during the period between the defendant's service as a director and his subsequent closing sales, in order to time those sales as advantageously as possible, was one of the kinds of abuses Congress sought to prevent. If defendants became statutory insiders of Susquehanna as part of the merger transaction, the same possibility of speculative abuse would exist with respect to them, and § 16(b) should be applicable.

I therefore conclude that the relevant inquiry, in terms of the purposes of § 16(b) and under *Kern*, is whether the acquisition has put the defendants in a position to obtain and use inside information in planning a disposition of Susquehanna stock during all or part of the six months' period following the acquisition. I proceed then to consider how this general principle should be applied to each of the individual defendants.

## II.

A. *Arch Scurlock*. Scurlock, prior to December 1, 1967, was a director and substantial shareholder of Atlantic, although, as the majority develops, he was thoroughly immunized from access to inside information. He had no control over the merger negotiations, and he had no access to information concerning the impending merger transaction. Were the possibility of speculative abuse test to be applied solely to events prior to the effective date of the merger, I would not quarrel too strenuously with the majority that Scurlock should not be

held accountable for short-swing profits under § 16(b).

On August 2, 1967, Scurlock cast the deciding vote in favor of a resolution of the Board of Directors of ARC submitting the proposed merger with Susquehanna to the shareholders for approval.[3] By the terms of the agreement of merger, he became a director of Susquehanna on December 1, 1967. On December 4th, the effective date of the merger, Scurlock exchanged his Atlantic stock for Susquehanna stock, and within six months, while still a director of Susquehanna, he made cash sales on the open market from his holdings of Susquehanna. Scurlock thus became a statutory insider—a director of Susquehanna—as part of the transaction whose characterization as a "purchase" *vel non* is at issue. I now turn to consider whether that transaction placed him in a position to make use of inside information about Susquehanna in planning his subsequent sales.

Although the majority characterizes Scurlock as an "outside" shareholder of Susquehanna who did not take any active role in managing Susquehanna and did not enjoy the confidence of its chief executive, it was stipulated that Scurlock did discharge his duties as director of that company. Section 16(b) presumes that a director has access to inside information that could be of speculative value. The statute draws no distinction between "active" and "passive" directors and, in the absence of evidence that a director did not in fact discharge the duties normally associated with that position, a conclusion that a director was not privy to inside information would seem to be at odds with the congressional intent.

The majority stresses also that the proxy statement, prepared in connection with the merger and made available to all stockholders of Atlantic and Susquehanna, fully disclosed the material facts concerning Susquehanna. There was thus, so the argument runs, no "inside" information possessed by Scurlock since all stockholders knew everything that it was important to know about Susquehanna. But these statements are true only with respect to "inside" information *before the effective date of the merger.* The record does not establish that Scurlock lacked access, by virtue of his position as a director after the merger, to information about Susquehanna that would have been useful to him in timing his subsequent sales of Susquehanna stock. Because Scurlock is presumed to have had access to such information after the merger and because I think that the proper application of the possibility of abuse test requires us, when the merger is the opening acquisition transaction, to determine whether such transaction placed the defendant in a position to abuse such information during the period six months after the merger, I would hold Scurlock liable under § 16(b).

Scurlock contends that he had no opportunity for speculative abuse of inside information during the post-merger period because his subsequent cash sales were made as part of a distribution of the Susquehanna stock registered under the Securities Act of 1933. He argues that, as a director and signatory of the registration statement, he had a continuing duty to disclose any material inside information, the omission of which would render the statement misleading. According to Scurlock, the presence of potential liability under the Securities Act, upon proof of failure to disclose inside information, eliminates the *possibility* of speculative abuse of inside information during the post-merger period. I deem this argument without merit.

---

3. It is worth noting this difference from one of the factors that led to a determination in favor of the defendant in *Kern*—the voluntariness of the transaction at issue. As it turns out, Scurlock could have vetoed the transaction. The corporate defendant in *Kern* did not enjoy a similar position; its inability to control the transaction at issue was one of the considerations that led the Court to reject a senselessly harsh application of § 16(b).

Section 16(b) was designed as a prophylactic rule that would permit recovery *without proof of actual abuse of inside information*, since such proof would be difficult to obtain. This policy would be frustrated if the presence of a potential cause of action under a provision of the Securities Act requiring proof of actual abuse for recovery is permitted to supplant § 16(b). I would not read the remedies as being alternative, but rather would read them as cumulative. I would affirm as to Scurlock with respect to his net profits. The judgment against him might be modified, however, with regard to the allowance of interest.

B. *Keith Rumbel*. Rumbel was a senior vice-president and stockholder of Atlantic prior to its merger into Susquehanna. Pursuant to the merger, Rumbel acquired Susquehanna stock in exchange for Atlantic stock. At the time of the merger, the Board of Directors of Susquehanna elected him "Senior Vice-President" of the "Atlantic Research Group," a division of Susquehanna pursuant to the terms of the merger agreement. Rumbel held this position when he sold certain of his shares of Susquehanna stock within six months of their acquisition.

The district court held Rumbel not liable under § 16(b) because he was not a statutory insider. The holding was based on the district court's finding that Rumbel's duties as an "officer," both of Atlantic and Susquehanna, were mere staff functions and routine administrative chores, and not such as to give him access to inside information. Gold v. Scurlock, 324 F.Supp. 1211, 1215 (E.D. Va.1971).

An examination of the record shows that the district court's findings were not clearly erroneous, and I would affirm on the ground that Rumbel was not an "officer" of Susquehanna within the meaning of § 16(b) as that term is defined in S.E.C. Rule X–3b–2.

The rule defines "officer" as

a president, vice-president, treasurer, secretary, comptroller, and any other person who performs for an issuer, whether incorporated or unincorporated, functions corresponding to those performed by the foregoing officers. 17 C.F.R. § 240.3b–2.

The rule has been held to be a valid exercise of the S.E.C.'s power under § 3(b), 15 U.S.C.A. § 78c(b) (1971), to define "technical, trade, and accounting terms." Lockheed Aircraft Corp. v. Rathman, 106 F.Supp. 810 (S.D.Cal. 1952); Lockheed Aircraft Corp. v. Campbell, 110 F.Supp. 282 (S.D.Cal. 1953).

I do not find persuasive plaintiff's argument that when the district court made an ultimate finding that Rumbel was one of three officers of Susquehanna (324 F.Supp. at 1215), it was established without further inquiry that Rumbel was an "officer" as defined by Rule X–3b–2. There is a semantic difference between "vice-president of the issuer," the obvious reading of the rule, and "vice-president of a division of the issuer." That this difference may be important is suggested by the rule that an officer of a subsidiary of the issuer is not an officer of the issuer, unless it is proven that he actually performs the function of an officer for the parent. Lee Nat'l. Corp. v. Segur, 281 F.Supp. 851 (E.D.Pa.1968). I do not think it sound to include, within the categories of "officers" specifically enumerated in Rule X–3b–2, a person beyond the literal scope of those categories. The general residual category set forth in the rule is obviously designed to govern whether persons, not within the literal scope of the specifically enumerated categories, should, nonetheless, be treated as officers. It follows, I think, that Rumbel was *not* an officer within the meaning of the rule and, hence, was not an officer for purposes of § 16(b). He was correctly exonerated from liability under § 16(b).

C. *Glenn L. Sloane*. Sloane was a vice-president and stockholder of Atlantic prior to its merger with Susquehanna. On December 1, 1967, he, like Rumbel, was elected a "vice-president" of the

"Atlantic Research Group," another division of Susquehanna pursuant to the terms of the merger agreement. His duties consisted of serving as manager of R & G Sloane, a subsidiary of Susquehanna. Pursuant to the merger which became effective December 4, 1967, Sloane exchanged his stock in Atlantic for stock in Susquehanna. On April 26, 1968, he was elected a vice-president of Susquehanna, and on May 8, 1968, he sold 500 shares of Susquehanna's preferred stock.

The district court held that Sloane was liable for the profits derived from these sales after finding that he was a corporate officer, both in name and in fact, of Atlantic before the merger, and Susquehanna thereafter. The majority reverses on the ground that the record contains no evidence to indicate that Sloane had any access to inside information concerning the merger during the pre-merger period, and as a result there was no chance that the transaction could serve as a vehicle for speculative abuse of inside information by Sloane. For the reasons which I have previously stated, I do not believe that Sloane's participation in the events that transpired and his access to inside information during the pre-merger period is determinative. Rather, I would look to the first six months of the post-merger period.

The district court made no findings with respect to Sloane's access to inside information by virtue of his position as a vice-president of the "Atlantic Research Group." Unquestionably, he obtained such position as part of the merger transaction, but it may well be that, like Rumbel, he was not an officer of Susquehanna as defined by Rule X–3b–2. During the six months post-merger period, he was elected a vice-president of Susquehanna. He undoubtedly became an "officer" of Susquehanna then, but I do not think that this alone would warrant applying § 16(b) to him, because there appears to be no connection, temporal or factual, between the merger

transaction and his becoming an officer. *Kern*; Blau v. Lamb, 363 F.2d 525–526.

As to Sloane, I would therefore remand to the district court for further exploration of whether, prior to April 26, 1967—the date of his election as an officer of Susquehanna—Sloane performed any functions for Susquehanna corresponding to those of any of the categories of officers enumerated in Rule X–3b–2. If the district court finds that he did, judgment should go against him; but if he did not, he should be exonerated.

D. *Arthur W. Sloan.* Sloan was a director, chief executive officer and major stockholder of Atlantic prior to its merger into Susquehanna, and he was privy to inside information concerning the merger during the pre-merger period and exercised substantial control over the merger negotiations. As a result of the merger, Sloan acquired by exchange a block of Susquehanna stock; and he became chief executive officer of Susquehanna as expressly provided in the merger agreement. Within six months thereafter he made certain cash sales of his Susquehanna stock.

Because Sloan was not a statutory insider of Susquehanna during the pre-merger period, I would not rest my affirmance on the possibility of speculative abuse flowing from his actual knowledge during that period. But because Sloan, in accordance with the merger agreement, became the chief executive officer of Susquehanna when the merger was consummated, and continued to hold that position at the time of his sales of stock, he obviously had access to inside information that could have been used in timing his sales of Susquehanna stock. I therefore would conclude that his acquisition of Susquehanna stock as a result of the merger was a "purchase" within the meaning of § 16(b), and since he sold stock within six months thereafter while he was chief executive officer of Susquehanna, he, too, is literally covered by § 16(b) and his profits from the sales must be deemed to have inured to the benefit of Susquehanna.

The judgment against him should be affirmed subject only to possible modification for interest.

### III.

In entering judgments against the defendants (except Rumbel) for the benefit of Susquehanna, the district court directed that accrued interest at six percent per annum be added to defendants' net profits. The district court made no finding concerning the fairness of an interest award where a defendant was held liable for short-swing profits; rather, the interest was directed to be included as a matter of course. Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), holds that interest awards are within the trial court's discretion, and interest should be awarded in response to considerations of fairness. As the majority points out, district courts do not ordinarily award interest where "good faith" is shown to have existed on the part of any defendant.

I agree that the district court's failure to make any finding with regard to interest requires that that part of its judgments be vacated. Silence cannot be an indication of the exercise of sound discretion. The majority, however, with regard to Sloan, holds that he did not willfully violate § 16(b), and that it would be inequitable to allow interest on his short-swing profits in computing the judgment entered against him. My view is that the district court should be afforded the opportunity in the first instance to exercise its discretion as to whether interest should be included, and the majority's direction with reference to Sloan is a usurpation of the district court's discretion. The proceedings have been long, but the district court can certainly exercise its discretion on the basis of the present record without undue delay. I would, therefore, remand the question of interest with respect to Sloan, Sloane (as to whom I would also recommend the question of liability), and Scurlock to the district court for the exercise of its discretion in the first instance.