**TRANSCONTINENTAL REALTY INVESTORS, INC., Plaintiff,**

v.

**GOTHAM PARTNERS, L.P., Gotham Partners III, L.P., Gotham Partners International, Ltd, Gotham International Advisors, L.L.C., William A. Ackman, and David P. Berkowitz, Defendants.**

**No. 01 CIV.6782 MP.**

United States District Court,
S.D. New York.

Aug. 15, 2002.

Susman Godfrey, LLP (Steve Susman and William C. Carmody, Of Counsel), Dallas, TX, Milberg Weiss Bershad Hynes & Lerach, LLP, New York, for Plaintiff.

Proskauer Rose, LLP (Leon P. Gold, Linda I.T. Zabroskie, Arnold Jacobs, Of Counsel), New York City, for Defendants.

## DECISION

POLLACK, Senior District Judge.

A motion for summary judgment is before the Court in a suit predicated on § 16(b) of the Securities Exchange Act of 1934. Under traditional procedure an Opinion from the Court would call for an initial explanation of the issues presented. In this unusual case however, the controversy between the parties is best initially presented by a historical review of the circumstances which gave rise to the controversy to illumine the transactions and proceedings involved and aid in their understanding and in the merits of the motion. Accordingly, with a preliminary introduction of the parties and the cause we will proceed with the matter as it unfolded chronologically.

The plaintiff known as Transcontinental Realty Investors, Inc. (hereafter "TCI") is organized and existing under the laws of Nevada with its principal place of business in Dallas, Texas. TCI owns and operates commercial real estate. TCI is a public company whose common stock is registered with the SEC. Its shares are listed and publicly traded on the New York Stock Exchange.

The defendants, "Gotham Entities" are comprised of three principals, namely Gotham Partners, L.L.P., Gotham Partners III LLP, both are limited partnerships, and Gotham Partners International ("International") and all are engaged in buying and selling securities. Also as defendants are the investment advisors and managers of those Gotham companies namely Gotham International Advisors, LLC., William A. Ackman and David Berkowitz.

TCI is affiliated with American Realty Investors, Inc. ("ARI") which owned approximately 50% of TCI's common stock, and Basic Capital Management ("BCM") which owned approximately 14.5% of TCI's common stock. TCI in turn owned approximately 24% of Income Opportunity Investors, Inc. ("IORI")

Gene E. Phillips is the "trustor" or grantor of the Gene E. Phillips Children's Trust which is the owner of BCM, which advises and manages TCI and its affiliate American Realty Trust, Inc. ("ART") ARI and IORI.

Although not an employee, officer or director of any of these companies, Mr. Phillips according to his son Bradford Phillips, generally "runs" BCM and is "highly involved" with all of its business decisions made concerning ART, ARI, and IORI.

In a federal criminal indictment filed on June 7, 2000, Gene E. Phillips was named

as a key figure involved in a plan to sell shares of ART through the use of threats, intimidation, beatings and kickbacks, a plan in which mob bosses and labor organizers were alleged to have participated.

When news of Mr. Phillips' indictment was publicly announced on June 15, 2000, TCI's stock price plummeted from $10¾ per share to as low as $2⅞ per share on June 16, 2000. Trading on the New York Stock Exchange was then halted from June 20, 2000 through June 26, 2000.

Because of the sudden decline in TCI's stock prices, a number of brokerage houses with whom TCI's affiliates had margin agreements sold blocks of the TCI stock collateral securing their margin accounts. As a result the Gotham Entities were able to purchase 525,000 shares of TCI stock through Cantor Fitzgerald & Co. on June 19, 2000, at a price of $4.4048 per share and 3700 shares on June 27, 2000, at $7.50 per share.

On June 27, 2000 shortly after 10:00 A.M. when the market had reopened a representative of Morgan Stanley telephoned David Berkowitz and offered him the opportunity to buy 1,253,200 shares of TCI stock at a negotiated price of $6⅛ per share. Berkowitz agreed to accept the offer on behalf of the principals of the Gotham Entities. Within 2 to 3 hours thereafter on June 27, 2000 Goldman Sachs & Co. who was designated to clear the purchase was furnished the allocation among the three principals of the Entities of the shares purchased for each one, namely 939,800 shares for Gotham Partners, LLP, 23,400 shares for Gotham Partners III, LLP, and 290,000 shares for International[1]. Gotham's controller,

Nicholas Botta, had only to calculate the exact number of shares to be placed in each Entity's account, which he did on that same day, in accordance with the Gotham Entities' standard practice and in accordance with his allocation of TCI shares on June 19, 2000. A June 19, 2000 e-mail confirmed that Mr., Botta was to allocate the TCI shares proportionately among the Gotham Entities. The trades cleared exactly as intended. Defendants sum up the next events as follows:

Unhappy with the sale of such a large portion of its affiliates' TCI holdings, TCI, ART, and its wholly owned subsidiary ART Holdings brought suit in the Dallas State Court against the defendants, the Section H Partners, and against its general partners Karenina Corp. and DPB Corp.,[2] alleging a conspiracy between Morgan Stanley and the Gotham Entities to conduct a "bargain basement" liquidation of the margin accounts of TCI's affiliates. That complaint, filed on September 6, 2000 sought to state claims against the Gotham Entities for conspiracy to breach Morgan Stanley's margin agreement with ART, conspiracy to breach Morgan Stanley's fiduciary duties to ART, conspiracy to convert property, and conspiracy to defraud. Morgan Stanley was not named as a defendant in the suit. Plaintiff's demand as to the Gotham Entities was for exemplary damages, imposition of a constructive trust over all TCI stock purchased, and a restraining order prohibiting the Gotham Entities from transferring any of their TCI stock. Particularly in light of plaintiff's failure to name alleged co-conspirator Morgan Stanley

---

**1.** Actually as Goldman Sachs was instructed those shares were placed with and in custody of the 100% owned subsidiary of International named "GRH" which administratively carried such securities for International. (This matter will be referred to again, later).

**2.** The Dallas County suit also named TCI affiliate Basic Capital Management, Inc. ("BCM") as a defendant. The reason for naming BCM, would seem to be that that inclusion destroyed diversity and ensured the suit would remain in Texas state court.

as a defendant in that suit, it is clear that plaintiffs' goal was to regain ownership of TCI stock for its affiliate and for its control of TCI. Within six months, on October 3, 2000 the Option Agreement in suit was executed and TCI's lowest share price at the time was $15.00. Karl L. Blaha, president of American Realty Investors, Inc. and IORI, who was also president of TCI, signed the Option Agreement.

### The Amended Complaints

On July 31, 2001, the plaintiff filed a First Amended Complaint alleging that through the purchases on June 11 and June 27, 2000 Gotham acquired over 10% of TCI's common stock and thereafter had purchased additional shares of such stock and that subsequently the Gotham principals on October 3, 2000 had entered into a Stock Option agreement with TCI's affiliates to sell 1,858,900 shares of TCI common stock held by Gotham Entities. The First Amended Complaint asserted that the option was exercised and the balance due thereon was paid for on April 5, 2001. Plaintiff in this suit then sought recovery of the profit only on the shares purchased after June 27, 2000 including 3700 shares from Cantor Fitzgerald in acknowledgment of the fact that the earlier purchases previously sued on did not constitute a "purchase" subject to § 16a-2(c). 17 CFR 240.16A–2.

■ However, a year later plaintiff filed a Second Amended Complaint this time claiming that the June 27, 2000 purchases by the Gotham principals had been sold on June 27th to Berkowitz, one of their advisors, on his own behalf and that he had made a resale thereof some hours later to the Gotham principals who thus became holders of stock that was subject to § 16(b) liability for any sale thereof within less than six months. Plaintiff alleged that the shares so acquired by the Gotham

principals from their advisor Berkowitz, having been sold in the stock option agreement dated October 3, 2001 were subject to § 16(b) accountability for the profits thereon. Morgan Stanley had never made the suggestion at any time that the briefly delayed allocation of the shares among the Gotham principals was of any business significance to the transaction or in any way affected the purchases intended for the three principals.

Suffice to say, there is no *evidence* in the record submitted on the motion that Morgan Stanley sold the 1,253,200 shares to Berkowitz individually and that he resold them to his principals on the same day. The plaintiff relies on the 2 or 3 hour delay on June 27 in furnishing the allocation among the principals and rules pertaining to an agent's failure to give an allocation when he accepted the transaction.

The unassailable facts presented on the motion for summary judgment do not support the amended theory of the plaintiff of a purchase by Berkowitz for his own account and a resale of the purchased shares on the same day to his principals. Plainly, this was added to offset the plaintiff's initial mistake in overlooking the law that the June 27 acquisition was not a purchase within § 16(b) because that purchase for the first time made the purchasers of 10 percent or more holders of the TCI stock.

The plaintiff fashions its contention substantially on the following dismemberment of the scenario of events:

Morgan Stanley phoned Berkowitz to offer the June 27, 2000 shares (totaling 1,253,200 shares) at a price of $6⅛ per share. Berkowitz agreed to buy but although acting as an agent he did not at that telephone talk tell Morgan Stanley the proportions in which the three Gotham Entities would take down the stock. The plaintiff then draws on law to the effect that a principal is not bound if the agent

has not in acceptance of the offer, expressed the allocation of the shares purchased by each individual purchaser but furnished the allocation 2–3 hours later that day and well before the transaction was settled. The amounts attributable to each of the three Entities were conveyed that day within some hours to Goldman Sachs, the firm designated to clear the transaction with Morgan Stanley and to take and pay the respective costs for each respective purchaser. Three days later the stock was delivered for the accounts of the three purchasers and paid for by each by Goldman Sachs. The internal Trade Ticket prepared by the employee of the purchasers on June 27 for the Gotham Group specifically records the allocation. Nothing except argument stamps Berkowitz as the purchaser and reseller to his principals. Berkowitz's name is not mentioned in any business record, either of Morgan Stanley or Goldman Sachs as having bought for his personal account. The notion that Berkowitz committed himself for his personal account to Morgan Stanley and then resold the shares to his principals some hours later on that day represents a convenient aberration by the plaintiff for the transactions of that day.

At the hearing on the motion the Court inquired from plaintiff's counsel who was very candid:

"The Court: The transaction was bound, wasn't it, in whole, the whole transaction was bound that day?n

Mr. Sussman: Absolutely.

The Court: And it was bound in the proportions of the allocations made that day?

Mr. Sussman: Yes, Sir"(20)

* * * * * *

"The Court: Weren't the partnerships severally bound that day, June 27th?

Mr. Sussman: They were severally bound by the end of the day absolutely. I will admit the difficulty here in the short period of time. If it had been two weeks, if the man had held the stock for—

The Court: This is all part and parcel of the same single transaction singularly executed, singularly confirmed and singularly described on that day, isn't that so?

Mr. Sussman: Absolutely. There is no question. I have to say that by the end of the day the partnerships were bound." (21)

* * * * * *

"Mr. Sussman: ... And so we are absolutely clear, if you conclude as a matter of law that the interim between 10 a.m. when Mr. Berkowitz made the deal and hours later that day when Bota gave the allocations are immaterial as a matter of law, we are out of here.

The Court: Let me ask you this as a result of your experience in the market. When was the settlement of that transaction in the normal course?

Mr. Sussman: Three days later, I believe.

The Court: Right. So that before the transaction was settled everybody knew everything that was involved here in that acquisition?

Mr. Sussman: Absolutely." (22)

The Court holds on the record that the principals of the Gotham Group were the only purchasers of the June 27th stock offering and that they were duly designated as such timely to effect the transactions and bind them thereto.

*The Added "GRH" Claim*

 International, one of the Gotham Entities, as an internal administrative matter, had substituted its 100% owned subsidiary (department) GRH, to take and pay for its allocated share of the June 27, 2000 purchase. Plaintiff seized on this in May 2002 to add GRH as a party defendant by amendment in its Second Amended Com-

plaint by alleging the following in paragraph 26:

"GRH's purchase of 290,000 shares of TCI common stock brought the group ownership to 10%. Gotham Partners' purchase of 939,8000 shares of TCI common stock and Gotham III's purchase of 23,400 shares of TCI common stock, which may have occurred simultaneously with GRH's purchase of 290,000 shares of TCI common stock, are nevertheless deemed to be separate purchases for the purposes of § 16(b) of the 1934 Act."

Under all the facts and circumstances shown in the summary judgment motion and responses thereto, the Court holds that as a matter of law there is no merit to that attempted additional claim. Nothing in the record disputes that GRH was merely a 100% department of International for its part of the transaction.

On June 28, 2000, defendants had ordered the transfer of funds from International's Goldman Sachs account to GRH's account to pay for the 290,000 Transcontinental Realty Investors shares bought the previous day from Morgan Stanley for International's Account. International was committed on June 27, 2000 to take and pay for those shares and the order of defendants to transfer funds from the Goldman Sachs account to GRH's account and to lodge the shares with GRH was an internal administrative matter of no consequences to § 16a-2(c).

The block purchase on June 27, 2000 was applicable to International as well as its wholly owned department (GRH) regardless of the administrative tasks that had to be accomplished before the trade could settle; it had no effect on the administrative allocation and payment. No § 16(b) liability can flow with regard to trades of those shares at any time that were placed in the custody and name of GRH.

In sum, the acquisition of TRI shares on June 27, 2000 by the Gotham Entities from Morgan Stanley, did not constitute a "purchase" by them for § 16(b) purposes. The shares of TCI stock that were purchased on June 27, 2000 directly from them raised their holdings of such stock above 10% of the outstanding shares but did not constitute the Gotham Entities as statutory purchasers on June 27, 2000. S.E.C. Rule 16a-27. 17 CFR 240.16A-2. No § 16(b) liability can exist with regard to trades of those shares.

The motion for summary judgment in favor of defendants is granted with respect to the transactions of June 2000 except for 3700 shares from Cantor Fitzgerald and the claims thereon in the Second Amended Complaint are dismissed on the merits.

All other pending motions are denied as moot.

With respect to so much of the Second Amended Complaint as pertains to the said dismissed claims, the parties are directed to consider and brief for the Court's consideration the question of costs, if any, with respect thereto under Rules 11, 26(g) and 37 Fed. Rules of Civ. Procedure.

Defendants shall submit a brief together with any supporting affidavits within seven business days from the date of this Order.

Plaintiff shall submit its reply within seven business days thereafter.

Courtesy copies of all papers thereon shall be submitted to the Court on the dates of the filings.

*The Additional Purchases by Gotham*

■ After the June 27, 2000 purchase of the 1, 253,200 shares, the Gotham Entities bought 27,700 additional shares of stock of TCI which were included under the October 3, 1970 Stock Purchase Option. The question of § 16(b) liability on those shares involves the question whether the Option Agreement executed on October 3,

2000 constituted a sale within the purview of § 16(b).

The events with respect to the settlement on October 3, 2000 as described to the Court (without any semblance of material factual dispute from plaintiff TCI) were as follows:

In accordance with the terms of that Option Agreement, plaintiffs, including TCI, filed a Notice of Non–Suit With Prejudice in the Dallas County case on October 3, 2000, "nonsuiting with prejudice all of its claims asserted herein" against Gotham Partners, L.P., Gotham Partners III, L.P. Gotham Partners International, Ltd., Gotham International Advisors, L.L.C., Section H Partners, L.P., Karenina Corp., DPD [sic] Corp., William A. Ackman, David P. Berkowitz and Basic Capital Management, Inc. The following day, the case was dismissed. An Amended Notice of Non–Suit With Prejudice was subsequently filed on October 11, 2000, which clarified that BCM was not being released from any claims. Yet despite failing to release BCM from any claims, TCI moved to withdraw all of its pleadings that same day.

This very Option Agreement, entered into at the request of TCI and its affiliates, and executed by TCI's president, is the basis for TCI's present § 16(b) claim. Having originally brought suit demanding recovery of their TCI shares, and having succeeded in their efforts to have the Gotham Entities transfer the entirety of their TCI holdings to TCI and its affiliates, TCI is now trying to utilize § 16(b) to take back a part of the amount they agreed to pay for those shares as settlement of the lawsuit they brought. The use of § 16(b) in this manner would allow plaintiff to renege on its contract with the Gotham Entities and reduce the consideration TCI and its affiliates should be paid for the Gotham Entities' shares.

Section 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p(b) (1997) (the Exchange Act) compels corporate insiders to disgorge profits earned on purchases and sales of securities made within six months of each other. The statute is designed to minimize the unfair use of inside information. Insiders included are beneficial owners of more than 10% of any class of equity security (other than an exempted security) that is registered under the Exchange Act, and officers and directors of issuers of such securities. Any profit by any person subject to the reporting requirements of § 16(a), realized on any purchase and sale, or sale and purchase, within any period of less than six months, of any nonexempt security of an issuer that has an equity security registered under the Exchange Act "shall inure to and be recoverable by the issuer." An exception exists when the security was purchased in good faith in connection with a debt previously contracted.

Liability for the short term profit on the 27,700 shares depends on whether the Stock Option Agreement in this case was a sale within § 16(b) or because of its extraordinary earlier background and circumstances of the pressure of a claimed injunction and against disposition of the shares on claims of conspiracy with Morgan Stanley, to deprive the owners of the stock and on the facts and circumstances herein, the Court would ordinarily not regard the Option Contract as a sale for § 16(b) purposes.

In § 16(b), Congress enacted a bright line prophylactic rule of strict liability. Such a rule was deemed necessary in order to curb speculator abuse of insider information and to maintain investor confidence in honest, competitive securities markets. As the Supreme Court emphasized: "the only method Congress deemed effective to curb the evils of insider trading

was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was thought to be intolerably great." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 592, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973)

■ Exceptions to the rule of strict liability for § 16(b) should not be created lightly; the purpose of Congress was to curb the evils of insider trading.

However, as the Supreme Court declared, an appropriate inquiry is whether the particular type of transaction examined in the mold of its occurrence gives rise to speculative abuse. The Supreme Court has taught that the mere execution of a stock option to sell is not generally regarded as a sale. The prevailing view is to apply the statute only when its application would serve its goals. "Courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to insider information."

The option agreement before the Court was not a source of potential speculative abuse; it was not of itself a "sale." It was grounded on the mutual advantages to TCI and its affiliates both of whom wanted to obtain for the issuer of the securities and its affiliates the control value of recapturing nearly a quarter of the control of the issuer and the desire of the Gotham Entities to have done with the undesirable association and the unacceptability of the unwelcome and unrestrained charges found in the litigation in an atmosphere of deep hostility evidenced over and over again by the conduct of depositions allegedly in the interest of a client.

Further, there is a suspicion that cannot be ignored that the underlying purpose was to use § 16(b) as a means to recoup the loss by TCI's affiliates of their substantial stock positions in TRI by the sellouts in June 2000 and the loss of the profits thereon accruing to the accused Gotham Entities in the interim up to the settlement of the Dallas lawsuit.

The circumstances all seem to add up to a quasi involuntary settlement and of an obnoxious (plainly unwarranted by the circumstances) charge of conspiracy and utter absence of advantage to the defendants. Certainly the transaction was an "unorthodox" arrangement in every realistic sense in an atmosphere where there was and is no possibility of speculative abuse from insider information.

In short, § 16(b) was never designed to be applied to these circumstances and the prevailing view is to apply the statute only when its application would serve its goals.

While on examination of the records the execution of the Stock Option Agreement does not appear to represent a sufficient possibility for the speculative abuse of inside information with respect to TRI's affairs to warrant permitting a holding that the option agreement was itself a "sale" within the meaning of § 16(b), the question poses some factual imponderables. The defendants seem to show that they were excluded from access to inside information. If so, the "sale" of the TRI stock pursuant to the Option to TCI's affiliates presented no opportunities for speculative abuse and is beyond the statutory purpose of § 16(b). *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593, 93 S.Ct. 1736, 36 L.Ed.2d 503, (1973); *Rosen v. Price Communications.* See also: *Blau v. Lamb* 363 F.2d 507 (2d Cir.1966), *cert den.* 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542. *Reliance v. Emerson Elec.Co.* 404 U.S. 418, 424, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972). *See* 54 Cornell Q 45 (1968). Gotham Entities has heretofore admitted liability under § 16(b) for the profit on those 27,700 shares on the assumption that the Stock Purchase Option on October 3, 2000 constituted a sale within the statutory pe-

riod; and actually deposited in Court the amount of the profit thereon. The defendants claim that this concession of liability thereon was mistaken and should be voided, an error on their part from which they seek relief which TCI opposes.

However, the motion of defendants to be relieved of their admission of 16(b) liability on the subsequent purchase of the 27,700 shares and sale thereof through the Stock Option of October 3, 2000, possibly involves triable issues of fact not determinable on motion for summary judgment.

A prompt trial thereon will be scheduled thereon. Counsel are directed to attend before the Court, in Chambers, on September 5th, 2002 at 10:30 a.m. with a draft Pre–Trial Order and an agreed charge to the Jury, to fix an early trial date.

SO ORDERED.